FILED

2005 Jun-29  AM 11:22
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BETH MOON AND PHYLLIS SOPER, PLAINTIFFS, | ] ] ] |
| v. | ]Case No. ]CV-02- 2414-VEH ] |
| BELLSOUTH TELECOMMUNICATIONS, INC., DEFENDANT. | ] ] ] ] |

## OPINION

This Court has before it the July 31, 2003, motion of Defendant BellSouth
Telecommunications, Inc. ("BellSouth") for summary judgment as to Plaintiff Beth
Moon's claims.  (Doc. 22)

### I.  Procedural History

Plaintiffs Beth Moon and Phyllis Soper commenced this action on October
1, 2002, by filing a complaint in this Court alleging separate and individual
violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §
2000e et seq., the Age Discrimination in Employment Act, 29 U.S.C. §621, et seq.,
and the laws of the State of Alabama, specifically, the Alabama Age

1

Discrimination in Employment Act.[1]  Plaintiff Moon alleges in her complaint that she was denied promotion(s) and that such positions were usually given to less senior and less qualified male and/or  younger employees, constituting disparate treatment gender and age discrimination in promotions.   Plaintiff Moon also contends that more men are allowed to function in a management position while females are denied access to the necessary testing to be promoted and are denied promotions, resulting in disparate impact discrimination based on gender.   In addition, Plaintiff Moon contends that when she exercised her statutory rights by filing a charge of discrimination and complaining to Defendant BellSouth regarding gender and age discrimination, she was further subjected to retaliation.

On July 31, 2003, the Defendant filed a motion for summary judgment asserting: (1) that Plaintiff Moon has failed to establish prima facie cases of disparate treatment for failure to promote based on gender and age, disparate impact based on gender, and retaliation; and (2) that even if Plaintiff Moon has established a prima facie case as to her discrimination and retaliation claims, Plaintiff Moon has failed to rebut the Defendant's legitimate, non-discriminatory, and non-retaliatory reasons for its employment decisions.

---

[1] The claims of Plaintiff Soper are the subject of a separate pending summary judgment motion filed contemporaneously with the summary judgment motion regarding Plaintiff Moon.

The Defendant has submitted evidence[2]  in support of its motion for summary judgment and filed a supporting brief on July 31, 2003.  On August 27, 2003, the Plaintiff filed a brief and evidence in opposition to the Defendant's motion for summary judgment.  The Defendant filed a reply brief on May 4, 2005.

## II.  Standard of Review

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.

_____

[2] The Defendant submitted the depositions of Plaintiff Beth Moon, Plaintiff Phyllis Soper, James Thomas Duttera Jr., Michael Ray Green, Leonard Glynn, Kasey Howard, Russell Minchew, Donald Rubin, Vince Seaward, Jeremiah Studdard, declarations by Kay Gough, Ralph Gray, Kasey Howard, Linda Lawrence, Steven Parker, Johnny Rimes, Donald Rubin, Marsha Shrout, and Bernell St. Cyr.  References to the deposition transcripts are denoted by the last name of the deponent, followed by the abbreviation "Dep.," followed by the page number or the deposition transcripts being referenced.

Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the

4

absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  <u>Fitzpatrick</u>, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may

5

either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III.  Relevant Facts[3]

1.   This controversy began with the filing of a charge of discrimination against Defendant BellSouth by Plaintiff Moon on or about August 18, 2000. Charge of Discrimination.  A cause finding was subsequently issued by the Equal Employment Opportunity Commission and suit was filed on October 1, 2002.  Complaint.

2.   Plaintiff Moon, born on June 12, 1954, began working for BellSouth on June 25, 1973, and has been employed with the company since that time. Complaint ¶ 14; Moon Dep. 23, 64, 49.

3.   Plaintiff  Moon is currently employed as an Electronic Technician ("ET")

---

[3] Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are presented in the light most favorable to the Plaintiff.  Facts are undisputed unless otherwise expressly noted.

in the CIA center (Customer Initiated Activity Center).  She transferred to that position from her job as an ET in the CWINS center (formerly Unbundled Network Center or "UNE" center)[4], to which she transferred in 1998.   Moon Dep. 49, 90 Complaint ¶¶ 14, 16.

4.     Plaintiff Moon took and passed several BellSouth tests in order to become an ET.  Moon Dep.73.

5.      The position of ET is a "craft" or non-management position, as opposed to management, and during the time relevant to this litigation there were roughly one hundred ETs in the UNE center, although the number varied.  These ETs were supervised in small groups by a "level 57" manager, who in turn reported to a "level 59" supervisor. Rubin Dep 33-34

6.     The UNE center is divided into two sections: Maintenance and Provisioning. Plaintiff Moon worked, during the relevant time period, in the provisioning section.   A level 59 supervisor, originally Thomas Duttera (hereinafter "Duttera") and later Donald Rubin (hereinafter "Rubin"), managed the provisioning section, and had several level 57 supervisors as direct reports. Rubin Dep. 34:3-11.

---

[4] The CWINS center was known as the UNE center during most of the time relevant to this litigation, and will for convenience be referred to as the UNE center throughout this Memorandum.

7.    Vince Seaward (DOB November 4, 1948) was Plaintiff Moon's first level manager, i.e., direct supervisor. Complaint, ¶20; Moon, 83:12-15; Seaward, 11:17-18.

8.    In order to move from a craft position into a management position, a BellSouth employee must take and pass a test. Howard Dep. 40.   Moon took the test required to move from craft to management in the 1980's, and passed, but was never promoted. Moon Dep. 90-92.  By the year 2000, the testing had been changed. The testing procedure was changed again during the time period relevant to this litigation. Rubin Dep. 52-55; Glynn Dep. 41-44.  Exhibit 1 to Rubin Dep.  Exhibit 2 to Rubin Dep.

9.    The "Access to Management" testing system, which was in place at the time Plaintiff Moon transferred into the UNE center, involved three separate tests, which included the BellSouth Management Abilities Test or BMAT test,  the Situational Judgment Inventory (SJI), and the Interpersonal Skills Assessment (ISA).     Exhibit 1 to Rubin Dep.

10.    Effective November 1, 2001, the testing was changed to abolish two parts of the test, the SJI and ISA,  leaving only the BMAT.  The new program was called the First Level Manager Development Program.  Exhibit 2 to Rubin Dep.

11.  The portion of the BMAT, which continued in use  had previously been determined by BellSouth to have a disparate impact based upon gender. Exhibit 13 to Rubin Dep.

12.  BellSouth contracts with a vendor, ASI, to handle testing of its employees. Rubin Dep. 50.

13.  A craft employee cannot take the test for promotion into management without the approval of a level 59 manager.  Rubin Dep. 59  Howard Dep. 28;  Green Dep. 19-20.

14.  During the year 2000, the UNE center was expanding its workforce, in anticipation of a higher work load.  In accord with the increase in the number of ET's in the center, a commensurate number of new level 57 managers were needed to supervise them.  Howard Dep. 45-46; Rubin Dep. 95.  It was the promotion of several allegedly lesser qualified younger males into these positions, despite her requests for advancement, which prompted Moon to file her Charge of Discrimination.  Moon Aff.  ¶ 2,31

**QUALIFICATIONS OF PLAINTIFF MOON TO TAKE THE BMAT AND SERVE AS A LEVEL 57 SUPERVISOR.**

15.  Plaintiff  Moon possesses the necessary skills to fill a level 57 supervisory position and possesses "above average" technical skills as an ET.  Seaward

Dep. 53; Rubin Dep. 81.

16.    In addition, in  order to be qualified for a UNE Center first-level manager's position, a candidate must possess certain attributes.  Rubin Dec., ¶6.  These attributes included technical competency, positive interaction with fellow employees, the ability to lead and effectively communicate with other employees, willingness to coach and develop other employees, satisfactory performance reviews, and be recommended for promotion by the other supervisors.  Rubin Dec., ¶6; Duttera, 36:3 - 37:5; 64:17-23; Howard, 28:22 - 29:14, 95:2-22.

17.    During the majority of the time relevant to this litigation, and for a total of almost three years,  Plaintiff  Moon's direct supervisor was Vince Seaward (hereinafter "Seaward").  He supervised her from approximately June 1999 until May 2002. Seaward Dep. 24.  The level 57 managers have more contact with ETs than the level 59 managers, as the level 59 managers spend most of their time with other managers.[5]  Rubin Dep. 42-43.

18.    Plaintiff Moon's first level 59 supervisor when she first came to the UNE

_____

[5] Rubin's position, that of level 59 supervisor, requires that he spend more time with managers than with ETs.  In deposition he explained that "[i]t is a function of the assistant manager" to observe the work of an ET and determine if it was up to speed.  He testified that he "infrequently" took it upon himself to observe the ETs.  Rubin Dep. 42-43.  A level 57 manager, such as Seaward, is in a much better position to determine how ETs interact with their peers. Howard Dep. 90.

center was Duttera. He moved to Atlanta in or around May, 2000, and Rubin became Plaintiff Moon's second level 59 supervisor.   Moon Dep. 46; Rubin Dep. 34; Duttera Dep. 46, 34.

19. Plaintiff Moon never received a negative performance review.  Seaward Dep. 68-69, 72.  Both Duttera and Rubin signed off on or reviewed various performance evaluations of Plaintiff Moon.  Duttera Dep. 31; Rubin Dep. 81-82.

20. Seaward allowed Plaintiff Moon to relieve for him in his absence on several occasions, and Plaintiff Moon was, in fact, his first choice to relieve for him.  Seaward Dep. 30-32.   When a craft employee relieves a supervisory employee, the craft employee is basically performing the job of the supervisor, with the exception that he or she cannot discipline other employees or sign off on certain payroll documents. Seaward Dep. 34; Howard Dep. 56.

21. On one occasion when Plaintiff Moon relieved for Seaward in his absence, he commended her with a "Simply the Best" award, a recognition of merit for her performance as a relieving supervisor. Seaward Dep. 32.

22. During the times Plaintiff Moon relieved for him, Seaward never received any complaints from any staff member about her performance, and he

believes she performed well in the relieving role.  Seaward Dep. 35.

23.    Seaward also recommended to Rubin, more than once,  and possibly to

Duttera (although he does not specifically remember doing so), that Plaintiff

Moon be allowed to sit for the management test. Seaward Dep. 29.

24.    Seaward told Rubin that Plaintiff Moon had relieved for him and had

performed satisfactorily.  Rubin's response was simply to continue putting

Plaintiff  Moon in relieving roles. Seaward Dep. 45.

25.    Seaward believes that Plaintiff  Moon possesses the necessary skills to be

a good first level manager, and he attempted to get her approved to take the

necessary tests.  Seaward Dep. 53, 51.

26.    Seaward considered Plaintiff Moon a resource, and went to her to solve

problems within the UNE Center.  Seaward Dep. 57, 58.

27.    Seaward had several new ETs sit with Plaintiff Moon in order to train on

different functions, and she in fact assisted in training these individuals.

Seaward Dep. 65. In the roughly three years he supervised her, he has never

known Plaintiff Moon to refuse to assist another ET with a problem.

Seaward Dep. 66

28.    During the expansion of the UNE center which began in 2000, dozens of

new ETs were hired, and came through the center in "classes" of twenty-five

12

(25) to thirty (30) about once a month.  Minchew Dep. 19-20.  Four male

ETs from the Birmingham UNE center were chosen as "trainers," beginning

in April 2000.  The group included Russell Minchew (hereinafter

"Minchew"), Michael Wilson (hereinafter "Wilson"), Jeremy Hamm

(hereinafter "Hamm"), and David Jones (hereinafter "Jones").  Minchew

Dep.15, 19-20.  The members of the training team received a "relieving

differential," an increase in pay, for performing this function.  Minchew

Dep. 20.

29.   Prior to the creation of the training team, the training of new ETs involved

sending them through classes and "technician to technician training,"

sending  a new ET to observe a more senior ET, to allow the new employee

to learn by example.   An ET who mentored a new employee in this fashion

would sometimes get a pay differential (an increase reflecting additional

duties of training a new employee).  Duttera Dep. 52-53.

30.   Plaintiff Moon  mentored, in this fashion, many employees, including, but

not limited to: Renee Hawley, Jeremy Hamm, Bud Hackock, Patrick

Hoffmeyer, and Keith Smith.  Duttera Dep. 53;  Moon Aff.  ¶ 8,12

31.   Duttera never received any complaint, of which he is aware, from the five

people listed above, or from any other ET, that Plaintiff Moon was difficult

to work with.  Nor does he remember ever receiving any complaints that she was difficult to get along with when acting as a relieving supervisor. Duttera Dep. 53-54.

32.     When asked in deposition, Seaward could not think of any ET in the center who was a better ET than Plaintiff Moon. Seaward Dep. 80, 81.

**Moon Accepts Opportunity to Act as Relief Supervisor in Jacksonville**

33.     In early December 2000, Kasey Howard, one of the Birmingham UNE's second level managers (a manager at the same level as Rubin) approached Plaintiff Moon and offered her the opportunity to assume a long-term relieving role in a new UNE Center in Jacksonville, Florida.  Complaint, ¶23; Moon, Dep. 164; Howard, Dep. 12.

34.      Plaintiff Moon understood that Rubin, Howard and others met to decide who to send to Jacksonville and that they selected persons who were both knowledgeable and willing to share that knowledge and who would represent Birmingham in a favorable manner.  Moon, Dep. 166-167.

35.     Rubin told Plaintiff Moon that he knew that she would do a good job in Jacksonville and implied that one of the reasons for sending her to Jacksonville was to enhance her chances for promotion by providing the relief opportunity.  Moon, Dep. 150-152.

14

36.   Plaintiff Moon accepted the opportunity and on December 11, 2000, Plaintiff Moon and two male employees were sent to Jacksonville where they worked in relief positions training and coaching new employees. Moon, Dep. 92-93; 167.

**MOON SOUGHT OPPORTUNITIES TO ADVANCE INTO MANAGEMENT.**

37.   Plaintiff Moon discussed the possibility of advancement with her superiors in the UNE center, including Duttera, Kay Gough (hereinafter "Gough"), Rubin, and Seaward.  She also sought permission to take the management tests.  Duttera Dep. 34;  Rubin Dep. 108-109;  Seaward Dep. 42; Moon Aff. ¶ 2.

38.   Duttera did not believe that Plaintiff Moon was qualified to be a supervisor because he did not believe Plaintiff Moon got along well with others based on what Gough and Seaward told him, including that Plaintiff Moon was a difficult employee to supervise and Gough's belief that Plaintiff Moon would be a difficult person with whom to work.  Duttera, Dep. 48-49; 58; 61-62; Gough Dec., ¶12.

39.   Rubin did not believe Plaintiff Moon was qualified for the first-level manager's position because she had not exhibited positive interactions with her fellow employees, the ability to lead and effectively communicate with

other employees and did not have the support of at least some of the other supervisors for promotion.  Rubin Dec., ¶22.

40.    In addition to his belief that she lacked certain qualifications for the first-level manager's position, Rubin did not select Plaintiff  Moon for a first-level  manager position in the UNE Center for a number of additional reasons.  Rubin Dec., ¶24.

41.    During her conferences with Rubin, Plaintiff  Moon asked numerous questions about the amount of money she would make in the manager's position.   Rubin Dec., ¶24.   Although some of the other candidates considered by Rubin discussed or joked about the increase in pay, no one that Rubin promoted asked questions about any increase during the actual interview process.  Rubin Dec., ¶25.  Plaintiff Moon's extensive number of questions about the increase in pay and Rubin's belief that she sought the promotion  primarily  for  financial  reasons  rather  than  to  perform  the additional responsibilities and obligations associated with the manager's position was one reason he did not select her for any of the available manager's positions.  Rubin Dec., ¶24.

42.    Plaintiff  Moon had also expressed on numerous occasions that she was not happy in the UNE Center.  Rubin Dec., ¶26.  Both Vince Seaward and Kay

Gough told Rubin that Moon was frustrated and wanted to leave the UNE Center.  Rubin Dec., ¶26; Seaward, Dep. 42-44; Gough, Dec. ¶15.  These representations and Rubin's belief, based on Plaintiff Moon's representations, that Plaintiff Moon would not remain in the UNE Center for an extended period of time, was an additional reason that Rubin did not select Plaintiff Moon for any of the available manager's positions.  Rubin Dec., ¶26.

43.   Rubin created various documents after he met with Moon on a few occasions to discuss the possibility of her advancing from craft into management.  Rubin Dep. 106-117, Exhibits 6, 7, 8.

44.   Rubin testified that he was not in the habit of memorializing meetings with his subordinates in writing, but felt compelled to do so because he was "uncomfortable" about his discussions with Moon concerning her advancement. Rubin Dep. 107-108. These documents reflected his concerns about his meetings with Moon and her reasons for promotion, but he never shared his opinions on her alleged weaknesses with Moon or attempted to coach her to improve in any of these areas. Rubin Dep.  112-113.

**MOON WAS DENIED THE OPPORTUNITY TO ADVANCE WITHIN BELLSOUTH.**

45.   Despite Plaintiff  Moon seeking opportunities for advancement, Duttera

17

never authorized her to take the management testing.   Duttera Dep. 34-35.

Although it was not his opinion that Plaintiff  Moon was unqualified to be

management, Duttera never authorized Plaintiff  Moon to take the tests,

"because [he] didn't know her interest was strong enough at the time.  And

[he] had some reservations about promoting her."  Duttera Dep. 35.  Mr.

Duttera's "reservations" were "[he] wasn't sure that she was the best

candidate for any job that I might have."  Duttera Dep. 35.  Duttera testified

that he had a negative opinion of Plaintiff Moon, and he believed that she

did not have the support of other managers in the center.  Duttera Dep. 60-

61.

46.     Duttera was under the impression that Seaward, Plaintiff Moon's immediate

supervisor, did not believe Plaintiff  Moon should be promoted into

management.   Duttera Dep. 60-61.   Seaward, however, testified in

deposition that he supported giving Plaintiff  Moon the opportunity for

advancement, and may have even recommended same to Duttera, although

he does not specifically remember doing so.  Seaward Dep. 29.

47.     Duttera informed Seaward that he disliked Plaintiff  Moon, but Seaward is

unaware of the reason.  Seaward Dep. 75, 76.  Seaward also remembers

having the opinion, at the time that Duttera left the center, that Plaintiff

Moon might have a chance to get promoted without Duttera as her level 59. Seaward Dep. 50.

48. Gough, a supervisory employee in the UNE center, also informed Plaintiff Moon that Duttera did not like her, although she was unsure why.  Moon Aff. ¶ 10

49. Both Duttera and Rubin believe it is certainly possible and likely probable that Duttera briefed Rubin on personnel, before leaving the UNE center for a new job in Atlanta, in order to familiarize Rubin with the center and its employees.  Rubin Dep. 75-76; Duttera Dep. 40.  Rubin gave weight to Duttera's opinions.  Rubin Dep. 121.

50. Rubin, who replaced Duttera,  also refused to allow Plaintiff Moon to take the BMAT until several months after she filed her EEOC charge of discrimination, whereas several younger male employees were sent, at the department's expense, to sit for the tests.  Moon Aff. ¶ 3, 4. For example, Minchew spoke with Duttera about his interest in taking the management tests and was approved to test within three (3) months of his request. Minchew Dep. 54-55. Attachment B to Defendant's Responses to Plaintiff's Second Interrogatories, Interrogatory number 2.  Moon Dep. 1.

**MALE AND/OR YOUNGER EMPLOYEES PROMOTED AND SUBSEQUENTLY ALLOWED**

TO TAKE THE BMAT TEST.

51.     From January 1, 2000 to December 1, 2002[6], the following individuals were

        promoted from the position of Electronic Technician to Network Manager

        (the level 57 supervisory position sought by Moon) in the Birmingham UNE

        center:

        Micah Kralik, hired on 10/26/98 and promoted on 4/16/00, at which time he

was 30 years old; Donald Hathcox,  hired on 1/4/99 and promoted on 4/16/00, at

which time he was 36 years old; Steve Townsend, hired on 4/14/97 and promoted

on 4/16/00, at which time he was 38 years old; William Houston, hired on 4/13/98

and promoted on 6/16/00, at which time he was 54 years old; Tommy Holt, hired

on 4/19/99 and promoted on 6/16/00, at which time he was 27 years old; John

Griffen, hired on 11/30/98 and promoted on 7/1/00, at which time he was 43 years

old; Michael Hyre, hired on 2/15/99 and promoted on 7/1/00, at which time he was

27 years old; Scott Stevens, hired on 11/9/98 and promoted on 7/16/00, at which

time he was 32 years old; Tellis Jolivette, hired on 10/12/98 and promoted on

8/16/00, at which time he was 26 years old; Kevin Green, hired on 3/30/98 and

promoted on 9/16/00, at which time he was 29 years old; David Jones, hired on

3/12/99 and promoted on 10/1/00, at which time he was 28 years old; Eric Johnson,

---

[6] During 2001, the expansion of the UNE center ceased and BellSouth has subsequently instituted a hiring freeze and downsized numerous employees. Howard Dep. 44.

hired on 3/5/99 and promoted on 10/1/00, at which time he was 23 years old; Ronald Cook, II, hired on 3/15/99 and promoted on 10/1/00, at which time he was 26 years old; David Patterson, hired on 6/7/99 and promoted on 10/1/00, at which time he was 36 years old; Michael Wilson, hired on 6/5/97 and promoted on 11/1/00, at which time he was 33 years old; Jeremiah Studdard, hired on 6/7/99 and promoted on 11/16/00, at which time he was 25 years old; T.G. Collum, Jr. hired on 11/17/69 and promoted on 12/1/00, at which time he was 52 years old; Robert Richey, hired on 6/7/99 and promoted on 12/1/00, at which time he was 21 years old; Jason Davis, hired on 10/5/98 and promoted on 12/16/00, at which time he was 27 years old; Jeremy Hamm, hired on 3/8/99 and promoted on 12/16/00, at which time he was 25 years old; Christopher Smitherman, hired on 5/3/99 and promoted on 12/16/00, at which time he was 21 years old; Keith Smith, hired on 4/19/99 and promoted on 5/1/01, at which time he was 31 years old; Donna McFarland, hired on 6/20/77 and promoted on 5/1/01, at which time she was 43 years old; Renee Hawley, hired on 3/9/99 and promoted on 5/16/01, at which time she was 26 years old; George Battles, Jr., hired on 7/19/99 and promoted on 5/16/01, at which time he was 32 years old; Jack Schall, hired on 5/10/99 and promoted on 6/1/01, at which time he was 30 years old; Jeffery Pybas, hired on 5/15/00 and promoted on 7/1/01, at which time he was 39 years old; Larry Cannon, Jr., hired on 7/19/99 and promoted on 7/1/01, at which time he was 33 years old;

Jerry Cates, hired on 7/17/00 and promoted on 7/1/01, at which time he was 33

years old; Joseph Garrison, hired on 4/10/00 and promoted on 7/16/01, at which

time he was 31 years old; Rodney Ballard, hired on 5/17/99 and promoted on

8/1/01, at which time he was 26 years old; Johnny DuBose, hired on 8/24/98 and

promoted on 8/16/00, at which time he was 30 years old.  Of these thirty-two (32)

individuals, only two (2) are female and four (4) are over the age of forty years.

Not a single individual on this list has more experience as an ET than Moon, who

became an ET in 1989. Plaintiff Moon was approximately 45 years old in 1999, 46

years old in 2000, and 47 years old in 2001when requested to be promoted.

Attachment B to Defendant's Response to Plaintiffs' Second Interrogatories,

Interrogatory number 2.  Moon Aff.  ¶ 1.

52.     Another ET allowed to proceed through the management testing process was

        Minchew.  He was subsequently promoted to a level 57 position in another

        department. Minchew's hire date with BellSouth is March 2, 1999, and he

        was promoted to the level 57 position on April 16, 2001.  Minchew Dep. 11-

        12, 25-26.

53.     Minchew spoke with Duttera about wishing to advance into management,

        and he estimates that he was authorized to sit for the BMAT within three

        months of that conversation.  Minchew Dep. 54-55.

54.     A "code T26," has been described variously as "operator error" or "dropping

the ball" and in other ways, but it is understood by the ETs that when a technician "gets a T26" he or she "blew it."  Rubin Dep. 142; Seaward Dep. 54-55.  Minchew Dep. 51.

55. Minchew, who was allowed to sit for the test and subsequently promoted over Plaintiff  Moon, definitely received one T26 and testified that he "probably received several." Plaintiff  Moon never received any.  Minchew Dep. 51; Seaward Dep.56.  Further, although he had functioned as a "work leader" ( a position which is different from a relieving role, and one in which an employee may be placed even when his or her supervisor is present),  Minchew had never even relieved for his supervisor, as Moon had on several occasions.   Minchew Dep. 43.

56. Regarding certain of the other individuals promoted, Plaintiff  Moon mentored, trained and/or assisted at least 30 other technicians, all of whom have since been promoted to a level 57 position.  These individuals include: Jeremy Hamm,, Michael Wilson, Jeremiah Benson, Russell Minchew, Jason Davis, Johnny Dubose, and others.  Moon Aff. ¶ 12.

57. Seaward does not believe that Minchew, Hamm or Wilson, all of whom were allowed to sit for the test and promoted over Plaintiff  Moon, were better ETs than Plaintiff  Moon.  Seaward Dep. 80,81

58. Jeremiah Studdard, hired on June 7, 1999, who had never expressed to any

of his superiors a desire to move into management, was approached by Tommy Holt about taking the test roughly a year after he became employed by BellSouth.  Studdard Dep. 17-18.  He was then authorized to take the test.  Id.

59.   Some of the younger male employees who were selected to be sent through management testing were provided with a tutor to help them in passing the test.  Becky Brown, a retired BellSouth employee, was brought in to assist at least two male employees, Steve Townsend and David James in passing the test.  Moon Dep. 180-185.

## THE TRAINING GROUP

60.   As described above, a training group was created to train the dozens of new ETs being hired beginning in April 2000.  Minchew Dep. 19-20

61.   All of the Birmingham ETs chosen for this position, which involved an increase in pay (a "differential") were male.  Minchew Dep.15, 19-20.

62.   Moon, although far senior to the four males chosen, was never asked if she was interested in participating.  Moon Aff. ¶5.

63.   This position was a "stepping stone" to management positions, and all four of the male employees who participated in the training group were eventually sent through testing and promoted.  Minchew Dep. 47, 56-57; Defendant's Response to Plaintiffs' Second Interrogatories, Interrogatory

number 2.

**THE LEVEL 57 POSITIONS IN THE UNE CENTER.**

64.     Among the positions about which Plaintiff Moon complains is a series of

      Network Manger positions (level 57 supervisory positions) in the UNE

      center which were filled shortly after Rubin's arrival in the center.   Howard

      Dep. 44-47.

65.     According to Rubin, Plaintiff Moon was a qualified candidate for four of the

      positions subsequently filled by other individuals.   Rubin Dep. Vol. II,

      Exhibits 1, 2, 3, and 4.

66.     Three of these four positions were filled by male applicants, none of whom

      had as much experience as an ET as Plaintiff Moon.   Rubin Dep. Vol. II,

      Exhibits 1, 2, 3, and 4.

67.     Four other comparable positions were filled with male applicants who

      Duttera had placed in long-term relieving roles prior to Rubin's arrival.

      Rubin Dec., part of Defendant's Evidentiary Submission.

68.     As part of his decisional process, Rubin filled out "MSA packets," which

      explained his reasoning for selecting the candidate who was eventually

      awarded the position.   Rubin Dep. Vol. II, Exhibits 1, 2, 3 and 4.

69.     On every one of these MSA packets, he listed Plaintiff Moon as another

      "qualified applicant."   Rubin Dep. Vol. II, Exhibits 1, 2, 3, and 4.

**THE TESTING DISPARITIES**

70.   Until several months after Moon filed her charge of discrimination, she was never allowed to take the test.  EEOC Charge; Moon Dep. 105, 107,110,111; Moon Aff. ¶ 3

71.   Many younger male employees with many fewer years of experience were allowed to take the test. Defendant's Response to Plaintiffs' Second Interrogatories, Interrogatory number 2.

**BELLSOUTH VIOLATED ITS OWN WRITTEN POLICIES IN ORDER TO PROMOTE YOUNG MALE EMPLOYEES.**

72.   On or about October 27, 2000, Rod Odom, an officer in BellSouth's Network Division, issued a Network Services Briefing (intercompany memorandum) concerning the First Level Manager Development Program ("FLMDP").  Exhibit 2 to Rubin Dep.  The memorandum, directed to "All Network Employees," provides that "[b]eginning November 1, 2000, all First-Level Management Candidates will be required to complete the First-Level Manger Development Program (FLMDP)."  Exhibit 2 to Rubin Dep.

73.   The UNE center is part of Network. Green Dep. 15; Seaward Dep. 63.

74.   The briefing also states as follows:

   ●All candidates will pass through a three-tier screening process.
      ○ The first screen requires that all candidates pass the BMAT and have five years of Telecom experience.  Acting or Relieving Management

experience will be considered.

75.    On November 10, 2000, another Network Services Briefing was issued further describing the FLMDP, which contained a list of frequently asked questions.  Exhibit 12 to Rubin Dep.  Question 4 reads as follows:

**Q4: My organization has never had a testing requirement for management .  Does this mean that I must take this test in order to be promoted to a management position?**

A4: Yes.  This testing policy applies companywide.

76.    Despite the companywide mandate of the FLMDP for promotions, the level 59 supervisors in the UNE center did not consider themselves bound by it and did not follow it.  Rubin Dep. 56-57; Howard Dep. 38.  Rubin asked his supervisor, Frank Batusic, who informed him that he did not need to follow the policy.  Rubin Dep. 56.  Batusic does not outrank Rod Odom, the officer who issued the Network Services Briefing.  Rubin Dep. 56-57.  Howard was informed by someone that his level 61 supervisor, Jim Argo, said that the UNE center was not bound by the policy.  Howard Dep. 38.  Mr. Argo does not outrank Rod Odom.  Howard Dep. 39.

77.    Minchew, on the authorization of Duttera, tested under the Access to Management system, at the ASI testing facility in Birmingham. Minchew Dep. 31-32.  He took and passed the BMAT and the SJI portions of the test, but failed the third and final portion, the ISA.  Minchew Dep. 32,34-36.

27

78.   Before Minchew retested on the portion he failed, the FLMDP system had been instituted, and he was informed by Steve Parker that he was then management qualified. Minchew Dep. 48.  However, at the time he was promoted to a first level managerial position he had only a little over two years of telecom experience, instead of the five years required under the FLMDP system.[7]   Minchew Dep. 42.

**Moon's opportunity at the Work Management Center**

79.   Plaintiff Moon posted her resume on Career Link, a BellSouth intranet site used to look for positions within the company.  Moon Dep. 94-96, 98.

80.    After seeing her resume on Career Link, Leonard Glynn (hereinafter "Glynn"), who supervised the Work Management Center (hereinafter "WMC"), called Plaintiff Moon at her home during her Christmas 2000 vacation and indicated that he would like to interview her for a level 57 position.  Moon Dep. 99-100.  Glynn Dep. 19-23.

81.   After interviewing her, which he believed went well, Glynn introduced her to the other managers in his center as one of the leading candidates for the position.  Glynn Dep. 19-20, 28-29.

82.   Glynn also asked Michael Green, an acting level 58 manager in the WMC,

---

[7] At the time of his promotion, Minchew was 40 years old, his date of birth being 8/5/60. Minchew Dep. 8. In April 2000, when Minchew was promoted (albeit within a different center), Moon was 45, her date of birth being June 12, 1954.  Moon Dep. 23.

to interview Plaintiff Moon, since she seemed a promising candidate.  Green Dep. 44.

83.    Plaintiff  Moon had every qualification for which Glynn and Green were looking, with the exception of being ACCESS qualified (having taken and passed the BMAT).  Green Dep. 44-45.

84.    After the WMC expressed an interest in hiring Plaintiff  Moon into a level 57 position, in late December 2000, several months after Plaintiff Moon filed her charge of discrimination, Rubin authorized her to be tested.  Rubin Dep. 143.

## MOON'S EXPERIENCE WITH THE BMAT TEST

85.    Plaintiff Moon was working in Jacksonville when she was approved to take the BMAT, and she was given a number to call and schedule the test.  When she called the test was set up for January 17, 2001.  Moon Dep. 105, 107, 110-111.  This was the second time Plaintiff  Moon took a management test with BellSouth, having passed a predecessor to BMAT in the late 1980's.  Moon Dep. 90-93.

86.    Some of the people Plaintiff  Moon worked with in Jacksonville were also testing during the same week.  The other employees testing were new BellSouth hires, in their first six months to a year of employment, and were all male.   Moon Dep. 113.

29

87. This group of men included Dave McGinnis, Robert Hollinger, Charles Robertson, William Rudy, Steve Austin, John Sammond, David Silva, Albert Beck, Mario Ginevra, and F.H. Ackerman.  These men took the BMAT on various days of the same week that Plaintiff Moon tested.  Moon Dep. 114-118.  Based on information given to Plaintiff Moon by several of these men, they took the BMAT at an ASI facility.  Moon Dep. 120-121, 123.

88. Plaintiff  Moon followed the directions given her to locate the testing facility, and did not know that she was being sent to test at a BellSouth location until she arrived at the address and saw "BellSouth" on the building.  Moon Dep. 125-126.

89. The "Study Buddy," a package of study materials intended to help people prepare for the test, details the testing environment a candidate should expect.  Moon Dep. 126.  "Study Buddy" Bates numbers M/S 0050 *et seq.*

90. Green also Plaintiff Moon was also given internet links to study information by Green. Green 49-50.

91. The "Study Buddy" packet states that, upon arrival at the testing site, the candidate will be asked for two forms of identification, and will be placed in a room containing individual testing cubicles, each with a computer testing device.  "Study Buddy" Bates numbers M/S 0050 *et seq.*

92. The test is timed, and the computer testing device contains a timing mechanism.  Moon Dep. 130.  Minchew Dep.33

93. Prior to taking her test, Plaintiff Moon was told by the male employees who had tested earlier in the week that the test was similar to the information provided in the practice materials, and that they had tested on a computer. Moon Dep. 131-132.

94. On January 17, 2001, Shrout made the decision to administer Plaintiff Moon's BMAT test in the overflow room because the other testing rooms were full.  Shrout Dec. ¶7.

95. Shrout had no knowledge that Plaintiff Moon had complained of gender or age discrimination and had no knowledge that Plaintiff Moon had filed a charge of discrimination at the time Shrout decided to administer Plaintiff Moon's BMAT test in the overflow room.  Shrout Dec., ¶8.

96. When Plaintiff Moon arrived at the testing center, the waiting room was empty.  Moon Dep. 133.  Plaintiff Moon spoke with the receptionist, signed in and waited until the test administrator came to take her back.  She was not asked for any form of identification.  Moon Aff. ¶30 The proctor then escorted Plaintiff Moon to a small room, about the size of a closet, which contained filing cabinets, pictures leaning against the filing cabinets, and a small desk.  Moon Dep. 134-135.  The proctor had to clean off the desk for

Plaintiff Moon to take the test.  Moon Aff. ¶24, 31, 107.

97.   When Plaintiff Moon informed the proctor that this was not the testing environment she had expected, the proctor informed her that BellSouth was beginning to test for the BMAT at BellSouth, and that Plaintiff Moon was the first one they would be testing there.  Moon Dep. 136-137; 108.

98.   There was no clock in the room, nor a computer testing device.  Plaintiff Moon was given a test booklet and answer sheet.  Moon Dep. 136.  Plaintiff Moon informed the proctor that the environment was not what she was expecting, and that she did not believe that the room was an appropriate place to be taking the test.  Moon Dep. 138.  The proctor responded that if Plaintiff Moon left, even without taking the test, it would be treated as a failure, and that she would not be able to take the test again for six months.[8] Moon Dep. 138-139.  Moon Aff. ¶ 23, 31, 109.

99.   Plaintiff Moon asked for a different room in which to take the test and the proctor informed her that one was not available.  Moon Dep. 139.  However, on her way through the building to the small room, she saw several rooms

_____

[8] The Plaintiff's version of the stated facts are disputed by the Defendant.  The Defendant asserts that Shrout asked all test candidates, "Is there any reason why you feel you should not take this test today?"  If any candidate answered affirmatively, Shrout did not proceed to administer the test.  Shrout Dec., ¶9.

that appeared to be testing rooms which were empty, with the lights out and the doors open.  Moon Aff.  ¶24,31

100.    After completing the test, Plaintiff Moon was escorted back to the reception area where the receptionist "fumbled through the stuff – she had lots of papers and things on her desk, paperwork, and was looking for a template" to grade Plaintiff Moon's paper.  Moon Dep. 141-142.

101.    After the receptionist graded Plaintiff Moon's paper, she informed Plaintiff Moon that she had not passed.  Moon Dep. 143.

102.    Plaintiff  Moon was informed by Judith Masters, another BellSouth employee, that she (Masters) and two other women who tested at the same BellSouth facility in which  Plaintiff Moon tested (after Moon tested) were informed that they had failed the BMAT, but it was later discovered that the wrong answer key was used to grade their tests.  Moon Dep. 176-178. Moon Aff. ¶29, 36, 113.

103.    Prior to this experience, Plaintiff  Moon had taken and passed over one hundred thirty-five (135) BellSouth administered tests.  Moon Aff. ¶ 38, and Exhibit A to Moon Aff.  The BMAT was the only BellSouth test she ever failed.

**MOON IS UNABLE TO BE PLACED IN THE WMC POSITION**

104.    Since Plaintiff Moon did not pass the BMAT, she could not be hired into the

level 57 position at the WMC.  After learning that Plaintiff Moon had failed BMAT,  Glynn began a new round of interviews for the position. Glynn is unsure whether he would have needed to conduct a second round of interviews  if Plaintiff Moon had passed.  Green Dep. 45-46.  Glynn Dep. 35.

105.   Mr. Glynn had two final candidates - both female - for the manager position in the Work Management Center.   Green, Dep. 46.   However, both candidates were unsuccessful in completing the BMAT.  Glynn, Dep. 37; Green Dep. 50.

106.   The position Plaintiff Moon sought in the WMC was eventually given to a woman, Cathy Cates.  Glynn Dep. 29.

107.   In the WMC at the time, there was "a disproportionate amount of white male supervisors," in relation to the craft employees.  Green, Dep. 47-48.  This disparity was the subject of discussions in management meetings and had been the source of complaints from the craft employees in the WMC.  Green Dep. 52-53.

**INVESTIGATION INTO THE TESTING IMPROPRIETIES**

108.   Due to the unusual environment in which she tested, Plaintiff  Moon spoke with Green, who gave her the contact information to instigate an investigation into the procedures used at the ASI site.  He was not aware at

the time that Plaintiff Moon did not test at the ASI site.  Green Dep. 55-56.

109.  Plaintiff Moon complained regarding the testing environment and requested to re-take the test without waiting for the six month testing interval.  She discussed this with Green, Brenda Hardin, Bernard Ct. Cyr, Marsha Strout and at least one other person.  Moon Dep. 175.  Although BellSouth claimed to have investigated the matter, it was determined that the company had done nothing wrong.  Moon Dep. 176.

110.  Green felt that the testing situation was less than ideal, and that Plaintiff Moon would have performed much better in the standard testing environment.  Green Dep. 58.  Green even sent e-mails on Plaintiff Moon's behalf in an effort to afford her an opportunity to re-test.  Green Dep. 56-58.

111.  Green believed that Plaintiff Moon should be allowed to retest before the expiration of the six month interval, but despite Plaintiff Moon's and Green's efforts, BellSouth would not waive the testing interval and allow Plaintiff Moon to re-test at an ASI facility.  Green Dep. 62.

112.  After the treatment she received vis a vis her testing and the investigation which followed it, Plaintiff Moon elected not to re-test, believing it to be futile, as she did not believe she would be treated fairly. Moon Aff. 23, 34.

**FURTHER RETALIATION AGAINST MOON BY BELLSOUTH**

113.  After Plaintiff Moon filed her charge of discrimination in August 2000, and

was subsequently treated differently in the management testing process, she suffered further retaliation when the company "loaned" her to an office in Homewood, where she was put in a basement with no windows, in a "nasty cockroach-infested room" where she worked for almost a year. Moon Dep. 246.  The room to which she was assigned was also moldy and smelled badly, which made her physically ill, necessitating her to take time off work. Moon Dep. 291-293.

114.   At Plaintiff  Moon's request, the office was sprayed and this killed the cockroaches.  Moon Dep. 249-251. Plaintiff  Moon also acknowledged that BellSouth would send someone to clean up the mold each time Plaintiff Moon complained about it.  Moon Dep., 29.

115.   Plaintiff Moon was asked by Howard and Seaward to take this assignment, and agreed, but did not know at the time of the conditions in which she was volunteering to work.  Moon Dep. 251.

116.   Another UNE employee, Glenda Crockett, was also loaned to Homewood at this time.  Moon Dep. 249.

117.   Tim Davis and Charlie Bell supervised Plaintiff  Moon during this project and worked in the same basement in whichPlaintiff  Moon worked.  Moon Dep. 25-29.

## IV.  Applicable Substantive Law and Analysis

Plaintiff claims race-based discrimination in compensation and promotions, racially hostile work environment, pattern and practice of race discrimination, and retaliation under Title VII, 42 U.S.C. 2000e, and 42 U.S.C. § 1981.  Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a) (1994).[9]  The Court is aware that the summary judgment rule applies in job discrimination cases just as in other cases.  See Chapman, 229 F.3d at 1025 (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

The analysis of the plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims.  See Standard, 161 F.3d at 1330 (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").  In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence,

---

[9]The same framework used to analyze claims under Title VII is also employed in assessing claims of employment discrimination under § 1981.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

circumstantial (indirect) evidence, or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence).  A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is "[s]uch evidence [which], if believed, proves the existence of a fact in issue without inference or presumption."  Burns v. Gadsden State Community College, 908 F.2d 1512 (11th Cir. 1990).  Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition).

Here, Plaintiff has presented only circumstantial evidence of racial discrimination.  "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668

(1973), and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." <u>Combs</u>, 106 F.3d at 1527. Under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. <u>See id.</u> at 1527-28. The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather, they are flexible and depend to a large degree upon the facts of the particular situation. <u>See, e.g., Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1185 (11th Cir. 1984); <u>Lincoln v. Board of Regents of Univ. Sys.</u>, 697 F.2d 928, 937 (11th Cir. 1983). In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[10] <u>See McDonnell Douglas</u>, 411 U.S. at 802 (hiring); <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); <u>see also Nix</u>, 738 F.2d at 1185 (discipline); <u>Pittman v. Hattiesburg Mun. Separate Sch. Dist.</u>, 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

---

[10]<u>See also</u> <u>McDonnell Douglas</u>, 411 U.S. at 802 n.13 (observing that "[t]he facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations").

Once the plaintiff has shown a prima facie case and, thereby, has created the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[11] See Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination drops out of the case and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[12]   Where the defendant articulates multiple  reasonable, legitimate, and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  See Combs, 106 F.3d at 1528.

---

[11]See Chapman, 229 F.3d at 1034 (stating that "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion").

[12]If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgment motion either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-49, 120 S. Ct. 2097, 2108-09 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating

a Rule 50 motion);[13] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993);

Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton

County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38

(interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun

Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

## A. **Discrimination in Promotions**

Plaintiff alleges that the Defendant discriminated against her based on

both age and gender by failing to promote her to one of the first-level manager

positions.  Plaintiff Moon asserts that such positions were usually given to less

senior and less qualified male and/or younger employees, constituting

disparate treatment gender and age discrimination in promotions.

A plaintiff asserting a cause of action under either Title VII, the Age

Discrimination in Employment Act ("ADEA"), or the Alabama Age

Discrimination in Employment Act ("AADEA") bears the initial burden of

establishing a prima facie case of discrimination. See Busby v. City of

Orlando, 931 F.2d 764, 777 (11th Cir. 1991); Goldstein v. Manhattan

Industries, Inc., 758 F.2d 1435, 1442 (11th Cir. 1985).  A plaintiff alleging a

Title VII, ADEA, or AADEA discrimination in promotion claim must

---

[13]The court in Chapman modified the statement in Combs contrary to this holding in
Reeves after noting that the standard for granting summary judgment mirrors the standard for
judgment as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

establish the following elements: (1) that [she] is a member of a protected minority; (2) that [she] was qualified and applied for the promotion; (3) that [she] was rejected despite these qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted.  Lee v. GTE Florida, Inc., 226 F.3d 1249 (11th Cir. 2000)  (citing Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999); Alexander v. Fulton Co., 207 F.3d 1303, 1339 (11th Cir. 2000).  Once an employee has established a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reasons for the employee's rejection.  Id.  If the employer meets this burden of production, the employee must then establish that the employer's proffered reasons were pretextual.  Id.  "In a failure to promote case based on [gender and age], a plaintiff cannot prove pretext by simply showing that [she] was better qualified than the individual who received the position that [she] wanted." "A Plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [gender and age]."  Lee, 226 F.3d at 1253 (citing Alexander v. Fulton Co., 207 F.3d 1303 (11th Cir. 2000).  Plaintiff must instead adduce evidence that the disparity in qualifications was "so apparent as virtually to jump off the page and slap you in the face."  Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 (11th Cir. 2001)(citing Denney, 247 F.3d at 1187 (11th Cir.

2001))(quoting Lee, 226 F.3d at 1253-54); accord Alexander, 207 F.3d at 1339-40 (all quoting Deines v. Texas Dep't of Protective & Reg. Servs., 164 F.3d 277, 280 (5th Cir. 1999)).  For the discrepancies to "jump off the page and slap you in the face," they must be of such weight and significance that no reasonable person could have chosen the selected candidate over the plaintiff. Lee, 226 F.3d at 1254.

Plaintiff Moon is a member of the protected class under Title VII, ADEA, and AADEA: she is a female and is over the age of 40.  Complaint ¶ 3; Moon Dep. 23.  The Defendant asserts that Plaintiff Moon was not qualified for a first-level manager position.  The Defendant alleges that the qualifications essential to the first-level manager position in the UNE Center included technical competency, positive interaction with fellow employees, the ability to lead and effectively communicate with other employees, willingness to coach and develop other employees, satisfactory performance reviews, and the recommendation of the other supervisors for promotion.  Rubin Dec., ¶6; Duttera Dep. 36-37, 64; Howard Dep. 28 - 29, 95.  Plaintiff Moon has provided evidence that she possessed the necessary skills to fill a level 57 supervisor position and possessed "above average" technical skills as an ET.  Seaward Dep. 53; Rubin Dep. 81.   Plaintiff Moon never received a negative performance review.  Seaward Dep. 68-69;  72.  Seaward, Plaintiff Moon's

level 57 manager, allowed Plaintiff Moon to relieve for him in his absence on several occasions.  Seaward Dep. 30-32.   In fact, Plaintiff Moon was  his first choice to relieve for him.  Id.   When a craft employee relieves a supervisory employee, the craft employee is basically performing the job of the supervisor, with the exception that he or she cannot discipline other employees or sign off on certain payroll documents. Seaward Dep.  34.  Howard Dep. 56.  During the times Plaintiff Moon relieved for him, Seaward never received any complaints from any staff member about her performance, and he believes she performed well in the relieving role.  Seaward Dep. 35.   On one occasion when Plaintiff Moon relieved for Seaward in his absence, he commended  her with a "Simply the Best" award, a recognition of merit for her performance as a relieving supervisor. Seaward Dep. 32.   In addition,   Seaward considered Moon a resource, and went to her to solve problems within the UNE Center.  Seaward Dep. 57, 58.  Seaward had several new ETs sit with Plaintiff Moon for her to train them on different functions.  Seaward Dep. 65.   In the roughly three years Seward supervised her, he has never known Plaintiff Moon to refuse to assist another ET with a problem.  Seaward Dep. 66.  Plaintiff Moon mentored many employees, including, but not limited to: Renee Hawley, Jeremy Hamm, Bud Hackock, Patrick Hoffmeyer, and Keith Smith.  Duttera Dep. 53.  Moon Aff. ¶ 8,12.   Duttera, is not aware of ever receiving any complaint from the five

people listed above, or from any other ET, that Plaintiff Moon was difficult to work with.  Nor does he remember ever receiving any complaints that she was difficult to get along with when acting as a relieving supervisor.  Duttera Dep. 53-54.

In order to move from a craft position into a management position, a BellSouth employee must take and pass a test. Howard Dep.  40.    Plaintiff Moon  took the test required to move from craft to management in the 1980's, and passed, but was never promoted. Moon Dep. 90-92.  Effective November 1, 2001, the testing was changed to abolish two parts of the test, the SJI and ISA,  leaving only the BMAT.  The new program was called the First Level Manager Development Program.  Exhibit 2 to Rubin Dep.  A craft employee cannot take the BMAT test for promotion into management without the approval of a level 59 manager.  Rubin Dep. 59  Howard Dep. 28;  Green Dep. 19-20.  Seaward believes that Plaintiff Moon possesses the necessary skills to be a good first level manager, and he attempted to get her approved to take the necessary tests.  Seaward Dep. 53, 51.  Seaward  recommended to Rubin, more than once,   and possibly to Duttera (although he does not specifically remember doing so), that Plaintiff Moon be allowed to sit for the management test. Seaward Dep. 29.  Plaintiff  Moon also discussed the possibility of advancement with her superiors in the UNE center, including Duttera, Gough,

Rubin, and Seaward, and sought permission to take the management tests. Duttera Dep. 34;  Rubin Dep. 108-109;  Seaward Dep. 42; Moon Aff.  ¶ 2. Plaintiff Moon alleges that her level 59 managers, denied her the opportunity to take the BMAT because of her age and gender, thus, preventing Plaintiff Moon from being qualified for a manager's position.   The Plaintiff has provided evidence that she repeatedly sought an opportunity to advance at BellSouth by requesting to be allowed to take the BMAT and its predecessor tests.  It is undisputed that, until several months after she filed her charge of discrimination with the Equal Employment Opportunity Commission, she was denied the opportunity to even take the test, much less the opportunity to fill a management position.

Plaintiff Moon has provided evidence that despite her qualifications and the recommendation of Seaward, she was denied the opportunity to take the BMAT test while male and/or younger employees with less experience and qualifications than Plaintiff Moon were routinely authorized to take the test. Many of those who passed were then promoted.  Plaintiff Moon provided a list of individuals that were promoted from the position of Electronic Technician to Network Manager (the level 57 supervisory position sought by Moon) in the Birmingham UNE center.  Of the thirty-two individuals, only two were female and only four were over the age of forty years: each individual possessed less

47

ET experience than Plaintiff Moon.   The Defendant asserts that Plaintiff

Moon's statistical argument is nonsensical.   Defendant Reply Brief p. 9.   In

Wards Cove, the Supreme Court emphasized the importance of limiting any

statistical comparison of the composition of the job at issue to the composition

of the qualified applicant pool.   Id. at 651-52.   Absent such carefully tailored

statistical proof, no inference of discrimination is possible.   See Groves v. Ala.

State Bd. of Ed., 776 F. Supp. 1518, 1524 (M.D. Ala. 1991).   The Defendant

is correct that Plaintiff Moon offers no evidence regarding the "qualified

applicant pool" for the first-level supervisor position.   The only information

she provides is the name of persons promoted, their date of birth, and their

gender.   However, Plaintiff Moon has identified that a promotion into

management was based on passing the BMAT test, which was not possible

absent authorization of a level 59 manager.   Further, Plaintiff Moon has

provided evidence that Minchew, a male ET, was authorized to take the BMAT

test within three months of his request.   In addition, Minchew had less

experience as an ET at BellSouth than Plaintiff Moon,  he never relieved for

his supervisor, and he received at least one T26, an operator error code, while

serving as an ET.   Although the Court does not sit as a personnel department

and substitute its business judgment for that of the employer, Plaintiff Moon

has provided enough evidence to establish that other equally or less qualified

48

employees who are not members of the protected minority were authorized to take the BMAT test and subsequently qualified to be promoted to a first-level manager position.

Once Plaintiff has established a prima facie case, the burden of production shifts to the Defendant to establish a legitimate nondiscriminatory reason for its decision. The Court finds that the Defendant has rebutted the initial inference of discrimination by articulating legitimate nondiscriminatory reasons for not authorizing Plaintiff Moon to take the BMAT test and subsequently promoting her to a management position. The Defendant has proffered that Plaintiff Moon did not possess the qualifications required for the first-level supervisor position. Plaintiff Moon's level 59 managers, Duttera and Rubin, believed that Plaintiff Moon did not have the support of the UNE Center supervisors, including Gough and Seaward, that she did not get along well with others (based on what Gough and Seaward told Duttera), that she lacked the ability to lead and effectively communicate with other employees, and that she had not successfully completed the BMAT test. Duttera Dep. 37; 48-49; 58; 60-62; 66; Rubin Dec. ¶22; Rubin Dec. ¶28, 33; Howard Dep. 40; Moon Dep. 103. Contrary to the testimony of Duttera, Seaward thought Plaintiff Moon was qualified to take the BMAT test and to serve as a level 57 manager. The Court finds that Plaintiff Moon has submitted enough evidence

49

to raise a genuine issue  of material fact regarding BellSouth's proffered reasons for its failure to promote Plaintiff Moon.  Plaintiff Moon has presented evidence of sworn testimony that Seaward believed Plaintiff Moon possesses the necessary skills to be a good first level manager and that he attempted to get her approved to take the necessary tests.  Seaward Dep. 53, 51.   Seaward recommended to Rubin, more than once,  and possibly to Duttera (although he does not specifically remember doing so), that Moon be allowed to sit for the management test. Seaward Dep. 29.  Plaintiff Moon often relieved for Seaward in his absence and on one occasion, he commended  her with a "Simply the Best" award, a recognition of merit for her performance as a relieving supervisor. Seaward Dep. 32.  In addition,  Seaward considered Plaintff Moon a resource, and went to her to solve problems within the UNE Center.  Seaward Dep. 57, 58.  Seaward had several new ETs sit with Plaintiff Moon in order for her to train on different functions, and she in fact assisted in training these individuals.  Seaward Dep. 65.   Hence, the Court finds that the Plaintiff has submitted enough evidence to raise a genuine issue  of material fact regarding whether BellSouth's reasons  for its  failure  to  promote  Plaintiff  Moon  are pretextual.

Based on the foregoing reasons, the Court finds that Plaintiff Moon has satisfied the elements of a prima facie case of discrimination in promotion

based on gender and age.  The Court further finds that the Plaintiff has submitted enough evidence to raise a genuine issue of material fact regarding BellSouth's reasons for its failure to promote Plaintiff Moon.  Accordingly, the Court denies the Defendant's motion for summary judgment as to Plaintiff's claim of discrimination in promotions based on gender and age.

## C. <u>Disparate Impact Based On Gender</u>

In the complaint, Plaintiff Moon asserts that more men are allowed to function in a management position while females are denied access to the necessary testing to be promoted and are denied promotions, resulting in disparate impact in promotions based on gender.  Complaint ¶43.  To establish disparate impact based on gender for purposes of a discrimination claim under Title VII, the employee must show: (1) the existence of a specific, facially neutral employment practice; (2) the existence of a statistically significant disparity among members of different groups affected by employment decisions; and (3) the existence of a causal nexus between the specific, facially neutral employment practice and the statistically significant disparity.  42 U.S.C. § 2000e-2(k); <u>Joe's Stone Crab</u>, 220 F.3d at 1274.

Although the Plaintiff alleged disparate impact based on gender in her complaint, the Plaintiff has not produced any evidence to establish such claim of discrimination.  "A party responding to summary judgment may not rest on

[her] pleadings to demonstrate the presence of an issue of fact." <u>Miranda</u>, 975 F.2d at 1533.    Accordingly, the Court finds that Plaintiff Moon has not provided evidence of the existence of a specific, facially neutral employment practice that has a significant disparity among members of different groups affected by the employment decisions.    Therefore, the Plaintiff's disparate impact claim fails as a matter of law.

### D. <u>Retaliation Claim</u>

The Plaintiff alleges in her complaint that after she filed a charge of discrimination, the Defendant retaliated against her by denying her promotions, placing her in an office infested with cockroaches and no windows while working on the Homewood project, and reducing her job duties.[14]  Plaintiff Moon further alleges that the Defendant retaliated against her by requiring her to take the BMAT test at a BellSouth location rather than an ASI location and that such retaliatory treatment  resulted in her not receiving the promotion to the WMC manager position.    The Defendant asserts that: (1) neither the voluntarily-accepted work assignment performed by Plaintiff Moon nor her testing conditions  constitutes an adverse employment action as a matter of

---

[14]Plaintiff Moon alleges in her complaint that the Defendant reduced her job duites. However, Plaintiff Moon has not provided any evidence to establish that her job duties were reduced.  Therefore, Plaintiff Moon's claim of retaliation based on a reduction in her job duties is denied.

law; (2) even if the testing conditions Plaintiff Moon encountered is an adverse employment action, Plaintiff Moon fails to allege that she suffered an adverse employment action causally connected to any protected activity; and (3) all of the allegedly retaliatory reasons were taken for legitimate non-retaliatory reasons.  The  protected activity in which Plaintiff Moon engaged was filing a charge of discrimination with the EEOC in August, 2000.   Charge of Discrimination, Exhibit 2 to Moon Dep.

Generally, to establish a prima facie case of retaliation a plaintiff must show:  (1) that [she] engaged in protected activity; (2) that [her]employer was aware of that activity; (3) that  [she] suffered an adverse employment action; and (4) that there was a causal link between [her] protected activity and the adverse employment action.  Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) (citing Little v. United Techs., 103 F.3d 956, 959 (11th Cir. 1997)).  The causal link requirement is to be construed broadly, and the Eleventh Circuit Court of Appeals has stated that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  Id. at 1460, quoting EEOC v. Reichhold Chem., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993).  The allocation of the evidentiary burdens will be determined by whether the evidence for establishing the retaliation claim is characterized as "direct" or "circumstantial" evidence.  Plaintiff Moon has

presented circumstantial evidence in this matter.

## 1. __Homewood Project__

Plaintiff Moon alleges that she suffered retaliation when the Defendant "loaned" her to an office in Homewood, where she was put in a basement with no windows and infested with nasty cockroaches.   Moon Dep. 246.  She worked at this location for almost a year. Id.  Plaintiff Moon alleges the room to which she was assigned was also moldy and smelled badly, which made her physically ill, requiring her to take time off work.  Moon Dep. 291-293.  At Plaintiff Moon's request, the office was sprayed and this killed the cockroaches.  Moon Dep. 249-251.  Plaintiff Moon also acknowledged that BellSouth sent someone to clean up the mold each time she  complained about it.  Moon Dep. 29.  Plaintiff Moon was asked by Howard and Seaward to take this assignment, and she agreed, but did not know at the time of the conditions in which she was volunteering to work at the time she agreed to do so.  Moon Dep. 251.

The Defendant relies on Davis v. Town of Lake Park, Florida, 245 F.3d 1232 (11th Cir. 2001) to assert that the Plaintiff's acceptance of a temporary work assignment with a few unpleasant conditions does not constitute an "adverse employment action."  In Davis, the Eleventh Circuit established a standard for determining whether an employment action is adverse.  The Court

held that to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment.  245 F.3d at 1239.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances. Id.

In the present case, Plaintiff Moon cannot demonstrate that the environmental conditions of the Homewood project caused a serious and material change in the terms and conditions of her employment.   The Defendant has provided undisputed evidence that Plaintiff Moon suffered no financial loss, loss of benefits, or change in shift while working in Homewood.  Moon  Dep. 253.  Further , Defendant has provided undisputed evidence that the Homewood location was exterminated and the mold was cleaned up each time Plaintiff Moon complained about it.  Moon Dep. 29.   In addition, Tim Davis and Charlie Bell worked with Plaintiff Moon in the basement on the Homewood project.  The Plaintiff has not provided evidence to establish that the environmental conditions of the Homewood project caused some serious and material change in the terms, conditions, or privileges of her  employment.

## 2.  **Denial of Promotions**

Plaintiff Moon asserts that she was subjected to retaliation when she was

continously denied an opportunity to take the BMAT test, which successful passage of which would qualify her to be promoted to a management position. Plaintiff Moon filed her charge of discrimination in August, 2000.  Charge of Discrimination, Exhibit 2 to Moon Dep.  It is undisputed that the denial of promotions is an adverse employment action.  Shortly after filing her EEOC charge, Plaintiff Moon spoke again with Rubin, her second level supervisor, concerning her continuing desire to move into management at BellSouth, or at least to be allowed to sit for the test.  Not only did Rubin deny her the opportunity, he began to create negative memoranda about Plaintiff Moon, although he is not in the habit of memorializing his conversations with subordinates.  Rubin Dep. 107-108.  Rubin testified that he memorialized his discussions with Plaintiff Moon because he felt "uncomfortable" about their conversations.  Rubin Dep. 107-108.  These documents reflect his alleged concerns about his meetings with Moon and her reasons for promotion, but he never shared his opinions on her alleged weaknesses with Moon or attempted to coach her to improve in any of these areas. Rubin Dep. 112-113.  Plaintiff Moon was not authorized to take the BMAT test until a manager in another department expressed an interest in placing Plaintiff in one of his level 57 openings.  Upon the WMC manager's request, Rubin authorized Plaintiff Moon  to take the test in January 2001.

Once Plaintiff has established a prima facie case, the burden of production shifts to the Defendant to establish a legitimate nondiscriminatory reason for its decision.  The Court finds that the Defendant has rebutted the initial inference of discrimination by articulating legitimate nondiscriminatory reasons for not authorizing Plaintiff Moon to take the BMAT test and subsequently promoting her to a management position.  As noted above in Section B, the Defendant has proferred that Plaintiff Moon did not possess the qualifications required for the first-level supervisor position.  Plaintiff Moon's level 59 managers, Duttera and Rubin, believed that Plaintiff Moon did not have the support of the UNE Center supervisors, including Gough and Seaward; that she did not get along well with others (based on what Gough and Seaward told Duttera); that she lacked the ability to lead and effectively communicate with other employees; and that she had not successfully completed the BMAT test.  Duttera Dep. 37, 48-49, 58, 60-62, 66; Rubin Dec. ¶22; Rubin Dec. ¶28, 33; Howard Dep. 40; Moon Dep. 103.  Contrary to the testimony of Duttera, Seaward thought Plaintiff Moon was qualified to take the BMAT test and serve as a level 57 manager.  The Court finds that Plaintiff Moon  has submitted enough evidence to raise a genuine issue of fact regarding BellSouth's reasons for its failure to promote her.  Plaintiff Moon has presented evidence of sworn testimony that Seaward believed that Plaintiff

Moon possesses the necessary skills to be a good first level manager. He also attempted to get her approved to take the necessary tests. Seaward Dep. 53, 51.

 Seaward  recommended to Rubin, more than once,  and possibly to Duttera (although he does not specifically remember doing so), that Plaintiff Moon be allowed to sit for the management test. Seaward Dep. 29.   Hence, the Court finds that the Plaintiff has submitted enough evidence to raise a genuine issue of material fact regarding whether BellSouth's proferred reasons were legitimate or based on retaliation.

**3.  BMAT Testing Conditions**

Plaintiff Moon  alleges that the Defendant retaliated against her by requiring her to take the BMAT test at a BellSouth location rather than an ASI location and that such retaliation resulted in her failing the test and not receiving the promotion to the WMC manager position.   Some of the individuals who took the BMAT test on various days of the same week that Plaintiff Moon tested included a group of  men: Dave McGinnis, Robert Hollinger, Charles Robertson, William Rudy, Steve Austin, John Sammond, David Silva, Albert Beck, Mario Ginevra, and F.H. Ackerman.  Moon Dep. 114-118. Based on information given to Plaintiff Moon by several of these men, they took the BMAT at an ASI facility.  Moon Dep. 120-121, 123. However, Plaintiff Moon was assigned to a BellSouth facility.

When Plaintiff Moon arrived at the testing center, the waiting room was empty.  Moon  Dep. 133.  Plaintiff Moon spoke with the receptionist, signed in and waited until the test administrator came to take her back.  She was not asked for any form of identification.  Moon Aff. ¶30.  The proctor then escorted Plaintiff Moon to a small room, about the size of a closet, which contained filing cabinets, pictures leaning against the filing cabinets, and a small desk.  Moon Dep. 134-135.  The proctor had to clean off the desk for Plaintiff Moon to take the test.  Moon Aff. ¶24, 31.  When Moon informed the proctor that this was not the testing environment she had expected, the proctor informed her that BellSouth was beginning to test for the BMAT at BellSouth, and that Plaintiff Moon was the first one they would be testing there.  Moon Dep. 136-137.  There was neither a clock in the room  nor a computer testing device.  Plaintiff Moon was given a test booklet and answer sheet.  Moon Dep. 136.  Plaintiff Moon informed the proctor that the environment was not what she was expecting and that she did not believe that the room was an appropriate place to be taking the test.  Moon Dep. 138.  The proctor responded that if Plaintiff Moon left, even without taking the test, it would be treated as a failure, and she would not be able to take the test again for six

months.[15]   Moon Dep. 138-139.   Moon Aff. ¶ 23,31.   Plaintiff Moon subsequently failed the BMAT test and was not promoted to the WMC manager position.   Prior to this experience, Plaintiff Moon had taken and passed over one hundred thirty-five (135) BellSouth administered tests.   Moon Aff. ¶ 38, and Exhibit A to Moon Aff.   The BMAT was the only BellSouth test she ever failed.

The Defendant alleges that Plaintiff Moon's supervisor, Rubin, did not have anything to do with the selection of where Plaintiff Moon took the BMAT.  Rubin Dep. 143.   The Defendant further alleges that Marsha Shrout, the person who decided where and under what conditions Plaintiff Moon would take the test, was not aware that Plaintiff Moon had engaged in protected activity.   Shrout Dec.  ¶7,8.

The Plaintiff engaged in a statutorily protected activity: she filed an EEOC charge in August, 2000.   Although Shrout was  not cognizant of Plaintiff Moon's EEOC filing, other supervisors at BellSouth including her level 59 manager, Rubin, had knowledge she had failed an EEOC charge. [16]

---

[15] The Plaintiff's version of the stated facts are disputed by the Defendant.  The Defendant asserts that Shrout asked all test candidates, "Is there any reason why you feel you should not take this test today?"  If any candidate answered affirmatively, Shrout did not proceed to administer the test.  Shrout Dec., ¶9.

[16]  Plaintiff Moon's supervisor, Rubin, acknowledged that, when he authorized her to take the BMAT test he was aware that Plaintiff Moon had filed an EEOC charge.  In order to state a claim for retaliation, Plaintiff Moon must establish that the decision maker had knowledge of

Disparate testing conditions for the BMAT test would constitute an adverse employment action.  The testing conditions Plaintiff moon were subjected are causally related to the adverse employment action.   Plaintiff Moon was authorized and took the BMAT test a few months after she filed her EEOC charge.

Once the plaintiff has established a prima facie case of retaliation, the Defendant must proffer non-retaliatory reasons for its employment decision. The Defendant alleges that Plaintiff Moon was assigned to take the test in an overflow room because the other locations at the test facility where full. Shrout Dec. ¶7.  Plaintiff Moon asked for a different room in which to take the test and the proctor informed her that one was not available.  Moon Dep. 139. However, on her way through the building to the small room, she saw several rooms that appeared to be testing rooms which were empty, with the lights out and the doors open.  Moon Aff.  24, 31.   Plaintiff Moon provided further evidence that Green felt that the testing situation was less than ideal and that Plaintiff Moon would have performed much better in the standard testing environment.   Green Dep. 58.   The Court finds that Plaintiff Moon has submitted enough evidence to raise a genuine issue of material fact regarding

---

Plaintiff Moon's protected activity.  Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000).

BellSouth's proffered reasons for the testing conditions, Plaintiff Moon encountered.

Based on the foregoing reasons, the Court finds that the Defendant's motion for summary judgment as to Plaintiff Moon's retaliation claim should be denied.

### V. Conclusion

For the reasons set forth above, the Court grants in part and denies in part the Defendant's motion for summary judgment as to Plaintiff's discrimination and retaliation claims.

**DONE** and **ORDERED** this 29th day of June, 2005.

_____
**VIRGINIA EMERSON HOPKINS**
**United States District Judge**