FILED

2005 Jun-29  PM 12:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION



| | |
|---|---|
| BETH MOON AND PHYLLIS SOPER, | ] |
|     PLAINTIFFS, | ] |
| | ] |
|     v. | ]Case No. |
| | ]CV-02- 2414-VEH |
| | ] |
| | ] |
| BELLSOUTH TELECOMMUNICATIONS, INC., | ] |
|     DEFENDANT. | ] |
| | ] |

## OPINION

This Court has before it the July 31, 2003, motion of Defendant BellSouth

Telecommunications, Inc. ("BellSouth") for summary judgment as to Plaintiff

Phyllis Soper's claims.  (Doc. 21)

### I.  Procedural History

Plaintiffs Beth Moon and Phyllis Soper commenced this action on October

1, 2002, by filing a complaint in this Court alleging separate and individual

violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e et seq., the Age Discrimination in Employment Act, 29 U.S.C. §621, et seq.,

and  the  laws  of  the  State  of  Alabama,  specifically,  the  Alabama  Age

1

Discrimination in Employment Act.[1]  Plaintiff Soper alleges in her complaint that she was denied promotion(s) and such positions were usually given to less senior and less qualified male and/or younger employees, constituting disparate treatment gender and age discrimination in promotions.   Plaintiff Soper also contends that more men are allowed to function in a management position while females are denied access to the necessary testing to be promoted and are denied promotions resulting in disparate impact discrimination based on gender.  In addition, Plaintiff Soper contends that when she exercised her statutory rights by filing a charge of gender and age discrimination Defendant BellSouth further subjected her to retaliation.

On July 31, 2003, the Defendant filed a motion for summary judgment asserting: (1) that Plaintiff Soper has failed to establish prima facie cases of disparate treatment for failure to promote based on gender and age, disparate impact based on gender, and retaliation; and (2) that even if Plaintiff Soper has established a prima facie case as to her discrimination and retaliation claims, Plaintiff Soper has failed to rebut the Defendant's legitimate, non-discriminatory, and non-retaliatory reasons for its employment decisions.

---

[1] The claims of Plaintiff Moon are the subject of a separate pending summary judgment motion filed contemporaneously with the summary judgment motion regarding Plaintiff Soper.

2

The Defendant has submitted evidence[2]  in support of its motion for summary judgment and filed a supporting brief on July 31, 2003.  On August 27, 2003, the Plaintiff filed a brief and evidence in opposition to the Defendant's motion for summary judgment.  The Defendant filed a reply brief on May 4, 2005.

## II.  Standard of Review

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.

---

[2] The Defendant submitted the depositions of Plaintiff Beth Moon, Plaintiff Phyllis Soper, James Thomas Duttera Jr., Michael Ray Green, Leonard Glynn, Kasey Howard, Russell Minchew, Donald Rubin, Vince Seaward, Jeremiah Studdard, declarations by Kay Gough, Ralph Gray, Kasey Howard, Linda Lawrence, Steven Parker, Johnny Rimes, Donald Rubin, Marsha Shrout, and Bernell St. Cyr.  References to the deposition transcripts are denoted by the last name of the deponent, followed by the abbreviation "Dep.," followed by the page number or the deposition transcripts being referenced.

Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. Id. at 324.

The substantive law will identify which facts are material and which are irrelevant. Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the

4

absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  <u>Fitzpatrick</u>, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may

either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III.  Relevant Facts[3]

1.  Soper, born on November 16, 1954, began working for BellSouth on May 29, 1972, and has been employed with the company since that time. Soper Dep. 24, Soper Aff. ¶1.

2.  Soper became an Electronic Technician ("ET") in BellSouth's Unbundled Network Element Center ("UNE Center") in March 1999. Soper Dep. 67. Soper transferred out of the UNE Center in March 2001. Soper Dep. 68-69.

3.  The "overall objective of the [UNE Center] was to test and turn up new unbundled network element products." Rubin Dep. 32. These products

---

[3] Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are presented in the light most favorable to the Plaintiff. Facts are undisputed unless otherwise expressly noted.

include "a host of broadband products ordered by other carriers" including, for example, digital subscriber line (i.e., "DSL") products.  Rubin  Dep. 32.

4.      The ET position is a non-management (i.e., "craft") position responsible for coordinating the provision and maintenance of circuits and lines for competitive local exchange carriers.  Rubin Dec., ¶1; Duttera Dep. 44-45. Although the number varied,  approximately a hundred ETs worked in the UNE Center in the summer of 2000.  Rubin Dep. 32 - 33.

5.       ET's are supervised by first-level managers (level 57 managers) who are, in turn, supervised by a second-level manager (level 59 managers).  Rubin Dec., ¶3.

6.      Soper had several first level supervisors during her time in the UNE center, including Jason Chambers (hereinafter "Chambers"), Tellis Jollivette, Jeremiah Studdard (hereinafter "Studdard"), and Steve Parker (hereinafter "Parker").  Soper Dep. 106-108.  Parker was Soper's first-level supervisor when she returned from central office to the UNE Center in March 2000. Soper Dep., 142-143.

7.      Soper's second level manager at the time she began working as an ET in the UNE Center was Thomas Duttera.  Soper, Dep. 106.  After Duttera moved to Atlanta, Kasey Howard became Soper's second-level manager on or about

7

July 1, 2000.  Soper, Dep. 108, 128; Howard, Dep. 17, 20-23.

8.  During part of the time Soper was an ET in the UNE center, she was responsible for heading up a program called "Fast Track," which was a joint program between BellSouth and the Communication Workers of America (CWA), the collective bargaining group.  Soper Aff.  The "Fast Track" program involved training craft employees (or prospective craft employees) so that they could be placed in certain positions, such as ET, prior to having passed all requisite tests.  When she agreed to take on the coordinator position for this program in UNE, she was told that "Fast Track" was her first priority, and it took precedence over all her other duties.   Soper Aff.¶ 10.  This program is heavily weighted toward training and mentoring other employees.  Soper Aff. ¶ 6.

9.  Soper's performance review completed by Studdard on December 5, 2000, during the time relevant to this litigation, was "more than satisfactory," the highest available ranking.  Studdard Dep. 26-27.

10.  Studdard recommended to Howard that Soper be allowed to sit for management testing.  Studdard Dep. 23-24.

11.  Another of Soper's first level supervisors, Chambers, awarded her a "Simply the Best" certificate of merit for her performance while he was her

supervisor.  Studdard Dep. 25.

12.     Studdard believes Soper to be a better than average ET, and although he did

not remember at deposition that she had relieved for him, he stated he would

have had no problem in allowing her to do so. Studdard Dep. 21. Soper

testified that she did in fact relieve for Studdard.  Soper Aff.¶12.

13.     Soper has received nothing but "satisfactory," and sometimes "more than

satisfactory" performance evaluations.  Soper Aff. ¶ 8; Studdard Dep. 26-27.

14.     Soper has never once received any complaint about her interpersonal skills

or about having a negative attitude, from any supervisor or superior, and was

unaware that they allegedly had such opinions about her until she read

BellSouth's brief in support of summary judgment.  Soper Aff. ¶ 8,11.

15.     Soper has never received a code T-26, which is an "operator error" or

jeopardy code indicating that a technician did something wrong.  Soper

Aff.¶ 16;  Rubin Dep. 142; Seaward Dep. 54-55; Minchew Dep. 51.

**Training Group**

16.     During the year 2000, the UNE center was expanding its workforce in

anticipation of a higher work load.  In accord with the increase in the

number of ET's in the center, a commensurate number of new level 57

managers were needed to supervise them.  Howard Dep. 45-46; Rubin Dep.

9

95.   Dozens of new ET's were hired, and came through the center in "classes" of twenty-five (25) to thirty (30) about once a month.  Minchew Dep. 19-20.   Four male ET's  from the Birmingham UNE center were chosen as "trainers," beginning in April 2000.  The group included Russell Minchew (hereinafter "Minchew"), Michael Wilson (hereinafter "Wilson"), Jeremy Hamm (hereinafter "Hamm"), and David Jones (hereinafter "Jones").[4]   Minchew Dep. 15, 19-20.  It was the promotion of several allegedly lesser qualified younger males into these positions, and into training positions, despite her requests for advancement, which prompted Soper to file her Charge of Discrimination.  Soper Aff.¶ 2.

17.   During May 2000, Parker began selecting people to participate in a new training program.  Parker Dec., ¶4.  Martha Sue Blythe (DOB July 10, 1951), a female, former BellSouth employee, developed the training program which was referred to as the "Training Rotational Plan" (the "Plan").  Parker Dec., ¶4; Rimes Dec., ¶3.  Blythe's program called for the Plan to borrow employees from various groups to become trainers for the newly hired employees.   Parker Dec., ¶5.

_____

[4] The birth dates and hire dates of all four individuals are contained in the factual summary of Beth Moon's Opposition to Summary Judgment and will not be restated herein.  All four are male and younger than the plaintiff.

18.   Soper does not know how people were selected for the training group; she does know that Parker supervised it.  Soper Dep. 185.

19.   Parker interviewed a number of candidates for the Training Rotational Plan. Parker Dec., ¶7.  Trainers were selected to train both new ET's and maintenance administrators.  Parker Dec., ¶7.

20.   Qualifications for the Plan included experience on the job, proven performance on the job, demonstrated interpersonal skills, effective communication and presentation skills, and a willingness to coach and develop other employees.  Parker Dec., ¶8.

21.   The initial group of ET trainers Parker selected consisted of both male and female employees from Atlanta and Birmingham.   Parker Dec., ¶10. Included in this group were Mike Wilson, Jeremy Hamm, Russell Minchew (DOB August 5, 1960), Michael Hyre, Calvin Edward (DOB June 7, 1959), Victoria Tarleton (DOB January 30, 1952), James Sanders, and  Dennis Hearndon (DOB December 27, 1960).  Parker Dec., ¶10.  Michael Hyre was replaced by David A. Jones when Hyre decided he did not want to be part of the training group.  Parker Dec., ¶10; Rimes Dec., ¶3.

22.   Sometime prior to August 2000, Parker selected four maintenance administrator trainers for the group:  Heather Jacobsen, Deborah Fontenot,

Lillie Williams (DOB August 5, 1951) and Barbara Lewis (DOB February 2, 1953).  Parker Dec., ¶11; Rimes Dec., ¶3.

23.    During August 2000, six ET trainers were added to the group:  Kenneth Overbey, Jeremiah Benson, Denise Levert (DOB May 12, 1953), Bernetta Vinson, Sophia Ligon and Rodney Tyson.  Parker Dec., ¶12; Rimes Dec., ¶3.

24.    Parker did not interview Soper for a trainer position because her name was never submitted by her director.  Parker Dec., ¶15.  The names of all of the other candidates that Parker interviewed were provided by their directors.  Parker Dec., ¶15.  Only persons who met the qualities Parker was seeking for the Plan were selected for the trainer positions.  Parker Dec., ¶16.

25.    Howard did not recommend that Soper be interviewed for the training group supervised by Steven Parker because she had poor communication skills and had refused to coach and train other BellSouth employees.  Howard Dec., ¶1.

26.    Parker would not have selected Soper to be a trainer even if her name had been submitted as a candidate because Soper did not possess at least two of the main qualities that were outlined in the Plan:  effective communication skills and a positive attitude.  Parker Dec., ¶17.  Parker knew that Soper was

12

weak in each of these areas from his experience as her first-level supervisor. Parker Dec., ¶17.

27. The members of the training team received a "relieving differential," an increase in pay, for performing this function. Minchew Dep. 20. A training differential is a "premium pay opportunity." Green Dep. 77.

28. Pursuant to the collective bargaining agreement, when a premium pay opportunity is available, management is to "poll" the craft employees in order of seniority to determine who wants the position. Polling requires personal contact with the craft employees, in order of seniority. Green Dep. 74-75, 80.

29. When the training group was formed, the craft employees were not polled. Instead, in at least Minchew's case, it was mentioned casually in the work area. Minchew Dep. 16.

30. To get around the terms of the collective bargaining agreement, BellSouth then allowed the four male employees  selected as trainers from the Birmingham center, to remain on a pay differential for almost exactly a year, taking them off for one day at a time every few weeks so as not to run afoul of the CBA. Minchew Dep. 21.

31. When Soper complained that the group had been formed without polling or

any other notice to more senior craft employees, her complaints fell on deaf ears.  Soper Dep. 235-237 and Exhibit 9 to Soper Dep.

32.   Soper  was not only not chosen for such a position, which involved a pay differential, she was not even notified about the opportunity and allowed to apply or interview for the position until the group was already filled.  Soper Aff.¶ 5.

**Failure to Promote**

33.   Soper expressed an interest to Howard in management opportunities.  Soper Dep. 156.   Howard met with Soper after she expressed an interest in management opportunities and asked her if she was serious about being promoted.  Soper Dep. 114-115; Howard, Dep. 58-59.  During this meeting, Howard explored the reasons Soper  wanted to be a supervisor and asked her other basic questions.  Soper Dep. 114-115; Howard, Dep. 58- 59.

34.   In order to be qualified for a UNE Center first-level manager position, a candidate must possess certain attributes.  Rubin Dec., ¶6.  These attributes include technical competency, positive interaction with fellow employees, the ability to lead and effectively communicate with other employees, willingness to coach and develop other employees, satisfactory performance reviews and be recommended for promotion by the other supervisors.  Rubin

Dec., ¶6; Duttera  Dep. 36- 37, 64; Howard, Dep. 28-29, 95.

35.   A craft employee cannot be promoted into management without taking and

passing a test, which is the BMAT.  Howard Dep. 40.  A craft employee

cannot take this test unless he or she is given authorization by a level 59

manager.  Rubin Dep. 59; Howard Dep. 28; Green Dep. 19-20.

36.   Soper never took the BMAT.  Soper Dep. 164.  Although Soper requested

to be promoted to management, she does not remember specifically asking

anyone if she could take the BMAT and no one ever told her that she could

not take it.  Soper, Dep. 196; 198.  However, she was never offered the

opportunity to take the BMAT.  Id.

37.   Studdard recommended to Howard that Soper and Jerry Higgs be allowed

to sit for the BMAT.  Studdard Dep. 23-24.  Howard never authorized Soper

to take the BMAT.  Howard Dep. 59.  However, Howard allowed Higgs to

sit for the test.  Studdard Dep. 23-24.  Howard also recommended that Renee

Hawley be allowed to take the BMAT.  Howard Dep. 74-75.  Hawley

successfully completed the BMAT and Howard promoted her to a first level

manager's position.  Howard Dep. 74-75. All of the persons Howard

promoted to first-level manager positions and/or authorized to take the

BMAT (a) satisfied the qualities that Howard felt were necessary to be a

15

UNE Center first-level manager and (b) applied for the first-level manager positions.  Howard Dec., ¶3.

38.   Soper posted her resume on Career Link, a BellSouth intranet site  used to find other positions within the company.  Soper Aff.  ¶15.

39.   Howard did not believe that Soper was qualified to be a first-level supervisor in the UNE Center because she refused to coach and develop other employees.  Howard Dec., ¶6.  During the fall of 2000, Soper refused to mentor and develop new ET's.  Howard Dep. 61, 72, 74, 82.  Howard expressly requested that Soper mentor other employees to evaluate Soper's coaching and development competencies, one of the qualifications of a first-level manager, but Soper declined.  Howard Dep. 72, 80.

40.   Howard sent Soper an email detailing his competencies for managers and informing her that her refusal to mentor new ETs hurt her.  Howard Dep. 75-78, EX-4.

41.   Soper never received the email Howard allegedly sent to her advising that her refusal to mentor due to the conflict of interest hurt her chances of being promoted.  Soper Aff. ¶ 14.  The "email" which Howard produced in this action was retrieved from Microsoft Word and bears no transmission confirmation or even any email addresses indicating that it was ever sent.

Howard Dep.  77, Exhibit 4 to Howard Dep.

42.    Soper has mentored employees through the Fast Track program, and has assisted other ET's with problems on a routine basis.  Studdard Dep. 34. Soper did not adhere to Howard's request to mentor because of her responsibilities in the Fast Track program.  She felt that additional mentoring would be a conflict of interest.  Howard was not familar with Soper's duties as part of the Fast Track program.  Howard 72-74.  Therefore, Howard did not equate Soper's training of new ET's with her mentoring duties in the Fast Track program.  Id.

43.    Howard also did not consider Soper for a first-level manager position because she never applied for any of his positions.  Howard Dep. 72, 74.

44.    Howard testified that he was unaware of what Soper's qualifications were as an ET because he did not observe her work.  Howard Dep.  57.  He also did not know what all of her qualifications were during the time he was her second level supervisor.  Id.

**Retaliation**

45.    Soper believes that she has not "been given a lot of training" in retaliation for filing her EEOC charge.  Soper Dep. 82.

46.    Soper complains about not receiving training on a Siemens switch when she

17

worked at BellSouth's location on Oxmoor Road between March 2001 and July 2002.  Soper Dep. 68-69, 83-88, 89.  Other employees who had worked at the Oxmoor location for much longer than Soper received the training.  Id.

47.   Soper received training for a light span in April 2002.  Soper Dep. 82-83.

48.   Soper received training on a multiplexor.  Soper Dep. 96-97.

49.   Soper received a one-day training course on another multiplexor as well.  Soper Dep. 101.

## IV.  Applicable Substantive Law and Analysis

Plaintiff claims race-based discrimination in compensation and promotions, racially hostile work environment, pattern and practice of race discrimination, and retaliation under Title VII, 42 U.S.C. 2000e, and 42 U.S.C. § 1981.  Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a) (1994).[5]  The Court is aware that the summary judgment rule applies in job discrimination cases just as in other cases.  See Chapman, 229 F.3d at 1025 (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

The analysis of the plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims.  See Standard, 161 F.3d at 1330 (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").  In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence).  A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is "[s]uch

---

[5]The same framework used to analyze claims under Title VII is also employed in assessing claims of employment discrimination under § 1981.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

evidence [which], if believed, proves the existence of a fact in issue without inference or presumption." Burns v. Gadsden State Community College, 908 F.2d 1512 (11th Cir. 1990). Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition).

Here, Plaintiff has presented only circumstantial evidence of racial discrimination.  "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." Combs, 106 F.3d at 1527.  Under the McDonnell Douglas and Burdine framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  See id. at 1527-28. The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather, they are flexible and depend to a large degree

upon the facts of the particular situation.  See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[6]  See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has created the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[7] See Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons."  Burdine, 450 U.S. at 254-

---

[6]See also McDonnell Douglas, 411 U.S. at 802 n.13 (observing that "[t]he facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations").

[7]See Chapman, 229 F.3d at 1034 (stating that "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion").

55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination drops out of the case and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[8]  Where the defendant articulates multiple  reasonable, legitimate, and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  See Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. at 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgment

---

[8]If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

motion either by proving that intentional discrimination did indeed motivate

the defendant or by producing sufficient evidence to allow a rational trier of

fact to disbelieve the employer's proffered legitimate reasons, thus permitting

but not compelling the trier of fact to make a finding of illegal discrimination.

See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-49, 120 S.

Ct. 2097, 2108-09 (2000) (pointing out that the production of the necessary

sufficient evidence by plaintiff will not always prevent the employer from

prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's

prima facie case, the probative value of the proof that the employer's

explanation is false, and any other properly considered evidence that supports

the employer's case are among other factors to take into account in evaluating

a Rule 50 motion);[9] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel

v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton

County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38

(interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun

Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

## A. **Discrimination in Promotions**

Plaintiff alleges that the Defendant discriminated against her based on

---

[9]The court in Chapman modified the statement in Combs contrary to this holding in
Reeves after noting that the standard for granting summary judgment mirrors the standard for
judgment as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

both age and gender by failing to promote her to one of the first-level manager positions in the UNE Center and by not selecting her for the training group. Plaintiff Soper asserts that such positions were usually given to less senior and less qualified male and/or younger employees, constituting disparate treatment gender and age discrimination in promotions.

A plaintiff asserting a cause of action under either Title VII, the Age Discrimination in Employment Act ("ADEA"), or the Alabama Age Discrimination in Employment Act ("AADEA") bears the initial burden of establishing a prima facie case of discrimination. See Busby v. City of Orlando, 931 F.2d 764, 777 (11th Cir. 1991); Goldstein v. Manhattan Industries, Inc., 758 F.2d 1435, 1442 (11th Cir. 1985).  A plaintiff alleging a Title VII,  ADEA, or AADEA discrimination in promotion claim must establish the following elements: (1) that [she] is a member of a protected minority; (2) that [she] was qualified and applied for the promotion; (3) that [she] was rejected despite these qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted.  Lee v. GTE Florida, Inc., 226 F.3d 1249 (11th Cir. 2000) (citing Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999); Alexander v. Fulton Co., 207 F.3d 1303, 1339 (11th Cir. 2000).  Once an employee has established a prima facie case, the burden shifts to the employer to articulate some

legitimate, nondiscriminatory reasons for the employee's rejection. Id.  If the employer meets this burden of production, the employee must then establish that the employer's proffered reasons were pretextual.  Id.  "In a failure to promote case based on [gender and age], a plaintiff cannot prove pretext by simply showing that [she] was better qualified than the individual who received the position that [she] wanted.""A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [gender and age]." Lee, 226 F.3d at 1253 (citing Alexander v. Fulton Co., 207 F.3d 1303 (11th Cir. 2000).  Plaintiff must instead adduce evidence that the disparity in qualifications was "so apparent as virtually to jump off the page and slap you in the face." Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 (11th Cir. 2001)(citing Denney, 247 F.3d at 1187 (11th Cir. 2001))(quoting Lee, 226 F.3d at 1253-54); accord Alexander, 207 F.3d at 1339-40 (all quoting Deines v. Texas Dep't of Protective & Reg. Servs., 164 F.3d 277, 280 (5th Cir. 1999)).  For the discrepancies to "jump off the page and slap you in the face," they must be of such weight and significance that no reasonable person could have chosen the selected candidate over the plaintiff. Lee, 226 F.3d at 1254.

Plaintiff Soper is a member of the protected class under Title VII, ADEA, and AADEA; she is a female and is over the age of 40.  Complaint ¶

25

4.

1. <u>First-level Manager Position</u>

The Defendant asserts that Plaintiff Soper was not qualified for a first-level manager position.  The Defendant alleges that the qualifications essential to the first-level manager position in the UNE Center included technical competency, positive interaction with fellow employees, the ability to lead and effectively communicate with other employees, willingness to coach and develop other employees, satisfactory performance reviews and` the recommendation of the other supervisors for promotion.  Rubin Dec., ¶6; Duttera Dep. 36-37, 64; Howard Dep. 28-29, 95.  Plaintiff Soper has provided evidence that she possessed the necessary skills to fill a level 57 supervisor position and possessed "above average" technical skills as an ET.  Studdard Dep. 21; Rubin, Dep. 81.  Plaintiff Soper has received  nothing but "satisfactory," and sometimes "more than satisfactory" performance evaluations.  Soper Aff. ¶ 8; Studdard Dep. 26-27.  Plaintiff Soper's performance review completed by Studdard[10] on December 5, 2000, during the time relevant to this litigation, was "more than satisfactory," the highest available ranking.  Studdard Dep. 26-27.  Chambers, another of Plaintiff

---

[10] Studdard was Plaintiff Soper's level-57 manager before he was promoted to serve as a level-59 manger.

Soper's first level supervisors, awarded her a "Simply the Best" certificate of merit for her performance while he was her supervisor.  Studdard Dep. 25.

Studdard believes Plaintiff Soper to be a better than average ET, and although he did not remember at deposition whether she had relieved for him, he stated that he would have had no problem in allowing her to do so. Studdard Dep. 21. Plaintiff Soper testified that she did in fact relieve for Studdard.   Soper Aff.¶12.  When a craft employee relieves a supervisory employee, the craft employee is basically performing the job of the supervisor, with the exception that he or she cannot discipline other employees or sign off on certain payroll documents. Seaward Dep.  34;  Howard Dep. 56.

In order to move from a craft position into a management position, a BellSouth employee must take and pass a test. Howard Dep. 40.    Studdard recommended to Howard that he allow Plaintiff Soper to sit for the BMAT management test.[11]  Studdard, Dep. 23-24.  Plaintiff Soper also expressed an interest to Howard in management opportunities.  Soper Dep. 156.  Although Soper requested to be promoted to management, she does not remember

---

[11] Studdard also recommended to Howard to allow Jerry Higgs to take the BMAT test. Studdard Dep. 23-24.  Howard never authorized Soper to take the BMAT.  Howard Dep. 59. However, Howard allowed Higgs to sit for the test.  Studdard Dep. 23-24.  Howard also recommended that Renee Hawley take the BMAT.  Howard Dep. 74-75.  Hawley successfully completed the BMAT and Howard promoted her to a first level mangers position.  Howard Dep. 74-75.

specifically asking anyone if she could take the BMAT and no one ever told her that she could not take it.  Soper Dep. 196; 198.  Plaintiff Soper alleges that it was general knowledge that in order to serve as a manager, an individual must be authorized to take the BMAT test and successfully pass it.  Plaintiff Soper expressed an interest in management opportunities to Howard.  Plaintiff Soper was never offered the opportunity to take the BMAT.  Id.   Plaintiff Soper alleges that she was denied the opportunity to take the BMAT test based on age and gender; thus, preventing Plaintiff Soper from being qualified for a manager's position.

Plaintiff Soper  has provided evidence that despite  her qualifications and the recommendation of Studdard, she was denied the opportunity to take the BMAT test while male and/or younger employees with less experience and qualifications than Plaintiff Soper were routinely authorized to take the test. Many of those who passed, were then promoted.  Plaintiff Soper  provided a list of individuals that were promoted from the position of Electronic Technician to Network Manager (the level 57 supervisory position sought by Soper) in the Birmingham UNE center.[12]   Attachment B to Defendant's Response to Plaintiff's Second Interrogatories, Interrogatory number 2; Moon

---

[12] Since many of the facts in the litigation are common to Plaintiffs Soper and Moon, Plaintiff Soper adopted by reference all facts appearing in Plaintiff Moon's brief to avoid duplication.

Aff. ¶1.  Of the thirty-two individuals, only two were female and four were over the age of forty years.   In <u>Wards Cove</u>, the Supreme Court emphasized the importance of limiting any statistical comparison of the composition of the job at issue to the composition of the qualified applicant pool.  <u>Id.</u> at 651-52. Absent such carefully tailored statistical proof, no inference of discrimination is possible.  <u>See</u> <u>Groves v. Ala. State Bd. of Ed.</u>, 776 F. Supp. 1518, 1524 (M.D. Ala. 1991).  Plaintiff Soper offers no evidence regarding the "qualified applicant pool" for the first-level supervisor position.  The only information she provides is the name of the persons promoted and their date of birth and gender.  Although Plaintiff Soper has not provided detail regarding the qualified applicant pool for the first level manager's position,, Plaintiff Soper has identified that a promotion into management was based on the passing of the BMAT test which was subject to the authorization of a level 59 manager. Therefore, she has provided evidence that the pool of individuals authorized to take the BMAT consisted primarily of more men than women.  Further Plaintiff Soper has provided evidence that Minchew, a male electric technician, was authorized to take the BMAT test within three months of his request.  In addition Minchew had less experience as an electric technician at BellSouth than Plaintiff Soper,  he never relieved for his supervisor, and he had at least one T26, an operator error code, while serving as an electric technician.

29

Although the Court does not sit as a personnel department and substitute its business judgment for that of the employer, Plaintiff Soper has provided enough evidence to establish that other equally or less qualified employees who are not members of the protected minority were authorized to take the BMAT test and subsequently qualified to be promoted to a first-level manager position.

Once Plaintiff Soper has established a prima facie case, the burden of production shifts to the Defendant to establish a legitimate nondiscriminatory reason for its decision.  The Court finds that the Defendant has rebutted the initial inference of discrimination by articulating legitimate nondiscriminatory reasons for not authorizing Plaintiff Soper to take the BMAT test and subsequently promoting her to a management position.  The Defendant has proffered that Plaintiff Soper did not possess the qualifications required for the first-level supervisor position.  Plaintiff Soper's level 59 manager, Howard, did not believe that Plaintiff Soper  was qualified to be a first-level supervisor in the UNE Center because she refused to coach and develop other employees. Howard Dec., ¶6.  During the fall of 2000, Plaintiff Soper refused to mentor and develop new ET's.  Howard Dep. 61, 72, 74, 82.  Howard expressly requested that Plaintiff Soper mentor other employees in order to evaluate Soper's coaching and development competencies, one of the qualifications of

a first-level manager, but Plaintiff Soper declined.  Howard, Dep. 72, 80.

Although Plaintiff Soper did not adhere to Howard's request, Plaintiff Soper provided evidence that she has mentored employees through the Fast Track program and has assisted other ETs with problems on a routine basis. Studdard Dep. 34.  While Plaintiff Soper was an ET in the UNE center, she was responsible for heading up a program called "Fast Track," which was a joint program between BellSouth and the Communication Workers of America (CWA), the collective bargaining group.  Soper Aff.  The "Fast Track" program involved training craft employees (or prospective craft employees) in order to place them in certain positions, such as ET, prior to them passing all requisite tests.  When she agreed to take on the coordinator position for this program in UNE, she was told that "Fast Track" was her first priority, and it took precedence over all her other duties.   Soper Aff.¶ 10.  This program is heavily weighted toward training and mentoring other employees.  Soper Aff. ¶ 6.  Soper did not adhere to Howard's request to mentor because of her responsibilities in the Fast Track program. Soper Aff. ¶10.  She felt that additional mentoring would be a conflict of interest.  Id.  Howard was not familiar with Soper's duties as part of the Fast Track program.  Howard Dep. 72-74. Therefore, Howard did not equate Soper's training of new ETs with her mentoring duties in the Fast Tract program.  Id.  Further, Howard testified that

31

he was unaware of what Plaintiff Soper's qualifications were as an ET becuase he did not observe her work.  Howard Dep. 57.  He also did not know what all of her qualifications were during the time he was her second level supervisor. Id.

Further, Howard did not consider Soper for a first-level manager position because she never applied for any of his positions.  Howard Dep. 72, 74.  Plaintiff Soper provided evidence that she expressed an interest in management opportunities to Howard.  Soper Dep. 156.  Howard met with Soper after she expressed an interest in management opportunities to discuss her aspirations of serving as a manager.  Soper Dep. 114-115; Howard Dep. 58-59.  She also posted her resume on Career Link, a BellSouth intranet site used to find other positions within the company.  Soper Aff. ¶15.  The Court finds that Plaintiff Soper has submitted enough evidence to raise geniune issues of material fact regarding BellSouth's proferred reasons for its failure to promote Plaintiff Soper to a first-level manager position.

2.  <u>Training Group</u>

The Defendant asserts that Plaintiff Soper was not qualified to be assigned to the training group.  During the year 2000, the UNE center was expanding its workforce, in anticipation of a higher work load.  In accord with the increase in the number of ET's in the center, a commensurate number of

new level 57 managers were needed to supervise them.  Howard Dep. 45-46;

Rubin Dep. 95.  Dozens of new ETs were hired, and came through the center

in "classes" of twenty-five (25) to thirty (30) about once a month.  Minchew

Dep. 19-20.  Four male ETs from the Birmingham UNE center were chosen as

"trainers," beginning in April 2000.  The group included Russell Minchew

(hereinafter "Minchew"), Michael Wilson (hereinafter "Wilson"), Jeremy

Hamm (hereinafter "Hamm"), and David Jones (hereinafter "Jones").[13]

Minchew Dep. 15, 19-20.  It was the promotion of several allegedly lesser

qualified younger males into these positions, and into training positions,

despite her requests for advancement, which prompted Plaintiff Soper to file

her Charge of Discrimination.  Soper Aff.¶ 2.

Parker selected people to participate in the training program.  Martha

Sue Blythe (DOB July 10, 1951), a female, former BellSouth employee,

developed the training program which was referred to as the "Training

Rotational Plan" (the "Plan").  Parker Dec., ¶4; Rimes Dec., ¶3.  Blythe's

program called for the Plan to borrow employees from various groups to

become trainers for the newly hired employees.     Parker Dec., ¶5.

Qualifications for the Plan included experience on the job, proven

---

[13] The birth dates and hire dates of all four individuals are contained in the factual summary of Beth Moon's Opposition to Summary Judgment and will not be restated herein. All four are male and younger than the plaintiff.

33

performance on the job, demonstrated interpersonal skills, effective communication and presentation skills, and a willingness to coach and develop other employees.  Parker Dec., ¶8.

Parker did not interview Plaintiff Soper for a trainer position because her name was never submitted by her director.  Parker Dec., ¶15.  The names of all of the other candidates that Parker interviewed were provided by their directors.  Parker Dec., ¶15.  Only persons who met the qualities Parker were seeking for the Plan were selected for the trainer positions.  Parker Dec., ¶16. Howard did not recommend Plaintiff Soper for the training group supervised by Parker because she had poor communication skills and had refused to coach and train other BellSouth employees.  Howard Dec., ¶1.

Although Plaintiff Soper has provided evidence that she served as a mentor in the Fast Track, the Defendant provided evidence that Parker would not have selected Plaintiff Soper to be a trainer even if her name had been submitted as a candidate because Plaintiff Soper did not possess at least two of the main qualities that were outlined in the Plan:  effective communication skills and a positive attitude.  Parker Dec., ¶17.  Parker knew that Soper was weak in each of these areas from his experience as her first-level supervisor.  Parker Dec., ¶17.  Employers are permitted to make employment decisions "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all,

34

as long as its action is not for a discriminatory reason." <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1187 (11th Cir.1984). A federal court "do[es] not sit as a super-personnel department that reexamines an entity's business decisions. Plaintiff Soper has not provided sufficient evidence that she was qualified to be assigned to the training group. Even assuming however, that Plaintiff Soper can establish a prima facie case, Plaintiff Soper can not demonstrate that the Defendant's preferred reason that Plaintiff Soper was not qualified was pretextual.

Based on the foregoing reasons, the Court finds that Plaintiff Soper has satisfied the elements of a prima facie case of discrimination in promotion based on gender and age as to her claim regarding the Defendant's failure to promote Plaintiff Soper to a first-level manager position. The Court further finds that Plaintiff Soper has submitted enough evidence to raise genuine issues of material fact regarding BellSouth's proferred reasons for its failure to promote Plaintiff Soper to a first-level manager position. Accordingly, the Court denies the Defendant's motion for summary judgment as to Plaintiff's discrimination in promotions claim based on gender and age regarding its failure to promote Plaintiff Soper to a first-level manager position. The Defendant's motion for summary judgment as to Plaintiff Soper's discrimination in promotions claim based on gender and age regarding the

Defendant's failure to assign Plaintiff Soper to the training group is granted.

## C. Disparate Impact Based On Gender

In the complaint, Plaintiff Soper asserts that more men are allowed to function in a management position while females are denied access to the necessary testing to be promoted and are denied promotions resulting in disparate impact in promotions based on gender. Complaint ¶43. To establish disparate impact based on gender for purposes of a discrimination claim under Title VII, the employee must show 1) the existence of a specific, facially neutral employment practice; 2) the existence of a statistically significant disparity among members of different groups affected by employment decisions; and 3) the existence of a causal nexus between the specific, facially neutral employment practice and the statistically significant disparity. 42 U.S.C. § 2000e-2(k); Joe's Stone Crab, 220 F.3d at 1274.

Although Plaintiff Soper alleged in her complaint disparate impact based on gender, Plaintiff Soper has not produced any evidence to establish such claim of discrimination. "A party responding to summary judgment may not rest on [her] pleadings to demonstrate the presence of an issue of fact." Miranda, 975 F.2d at 1533. Accordingly, the Court finds that Plaintiff Soper has not provided evidence of the existence of a specific, facially neutral employment practice that has a significant disparity among members of

36

different groups affected by the employment decisions. Therefore, the Plaintiff's disparate impact claim fails as a matter of law.

## D. <u>Retaliation Claim</u>

The Plaintiff alleges in her complaint that the Defendant retaliated against Plaintiff Moon after she filed a charge of discrimination by denying her promotions and training for the various positions she subsequently held after filing her EEOC charge.[14] The Defendant asserts that: (1) the denial of training does not constitute an adverse employment action as a matter of law; (2) even if the denial of training is an adverse employment action, Plaintiff Soper fails to allege that she suffered an adverse employment action causally connected to any protected activity; and (3) the Defendant's proferred reasons were taken for legitimate non-retaliatory reasons. The protected activity in which Plaintiff Soper engaged was filing a charge of discrimination with the EEOC in September, 2000.

---

[14]In the Complaint, Plaintiff Soper asserts that she was subjected to retaliation by the Defendant because she was denied promotions. However, the Plaintiff does not address such allegation in her brief opposing the Defendant's motion for summary judgment. Rule 56(e) of the Federal Rules of Civil Procedure requires the nonmoving party to go beyond the pleadings and by [her] own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. <u>Celotex Corp.</u>, 477 U.S. at 324. The non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)). Therefore, Plaintiff Soper has not satisfied her burden regarding her retaliation claim based on the denial of promotions. Plaintiff Soper's retaliation claim based on the denial of promotions alleged in her complaint is denied.

Generally, to establish a prima facie case of retaliation a plaintiff must show:  (1) that he engaged in protected activity; (2) that his employer was aware of that activity; (3) that he suffered an adverse employment action; and (4) that there was a causal link between his protected activity and the adverse employment action. Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) (citing Little v. United Techs., 103 F.3d 956, 959 (11th Cir. 1997)).  The causal link requirement is to be construed broadly, and the Eleventh Circuit Court of Appeals has stated that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Id. at 1460, quoting EEOC v. Reichhold Chem., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993).  The allocation of the evidentiary burdens will be determined by whether the evidence for establishing the retaliation claim is characterized as "direct" or "circumstantial" evidence.  Plaintiff Soper has presented circumstantial evidence in this matter.

Plaintiff Soper alleges that she suffered retaliation because the Defendant denied her a lot of training for the various positions she subsequently held after filing her EEOC charge.  The Plaintiff engaged in a statutorily protected activity; she filed an EEOC charge in September, 2000. Plaintiff Soper has the burden to establish that the decision maker had knowledge of Soper's protected    activity.    Brungart v. BellSouth

Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000), see also Clover v. Total Sys., 176 F.3d 1346, 1354 (11th Cir. 1999) ("At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action."); Brochu v. City of Riviera Beach, 304 F.3d 1144, 1156-57 (11th Cir. 2002) (reversing jury verdict in plaintiff's favor on Title VII retaliation claim and remanding for entry of judgment in Defendant's favor where decision maker's sworn testimony established that he had no knowledge that plaintiff had engaged in protected activity).  The training opportunities that Plaintiff  Soper alleges she was denied all occurred after her March 2001 transfer from the UNE Center.  Soper Dep. 68-69, 82-89, 96-97, 101.  Plaintiff Soper  has not provided sufficient evidence that the unidentified persons who allegedly denied her training had any knowledge that she had engaged in protected activity.

Even assuming, however, that Plaintiff Soper can demonstrate the decision maker had knowledge of her protected  activity, Plaintiff Soper can not demonstrate that she suffered an adverse employment action. The Defendant relies on Davis v. Town of Lake Park, Florida, 245 F.3d 1232 (11th Cir. 2001) to assert that the denial of training opportunities  does not constitute an "adverse employment action."  In Davis, the Eleventh Circuit established a standard for determining whether an employment action is adverse.  The

Court held that to prove an adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment. 245 F.3d t 1239. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances. Id.

In the present case, Plaintiff Soper cannot demonstrate that the alleged denial of training opportunities caused a serious and material change in the terms, conditions, or privileges of her employment.    The Defendant has provided undisputed evidence that Plaintiff Soper suffered no financial loss, loss of benefits, or demotion.  In fact, the evidence shows that Plaintiff Soper received several employment benefits even after Plaintiff Soper filed her EEOC charge.  At Plaintiff Soper's request, the Defendant granted Plaintiff Soper a transfer from the UNE Center to a BellSouth facility on Oxmoor Road in March 2001. Soper Dep. 68-69.  She worked at the Oxmoor Road location until July 2002.  Soper Dep. 68-69, 89.  Thereafter, Plaintiff Soper requested and the Defendant granted Plaintiff Soper's transfer to a BellSouth facility in Attalla because she wanted to be closer to home.  Soper Dep. 100.

Although Plaintiff Soper alleges that she was not given a lot of training at BellSouth after the filing of her EEOC charge, the Defendant provided

40

evidence that Plaintiff Soper has received at least three training classes subsequent to the filing of her EEOC charge.  Soper  Dep. 68-69, 82-88, 89, 96-97, 101.  Soper complains about not receiving training on a Siemens switch when she worked at BellSouth's location on Oxmoor Road between March 2001, and July 2002.  Soper Dep. 68-69, 83-88, 89.  Other employees who had worked at the Oxmoor location for much longer than Soper received the training.  Id.  The Defendant provided evidence that Plaintiff Soper received training for a light span[15] and multiplexor.  Soper Dep. 82- 83, 96-97.  Further, she  received a one-day training course on a DDM 2000.  Id.

The non-selection of Soper for training opportunities, particularly where she has received other training opportunities and has received other requested employment benefits (e.g., a transfer closer to home), is not an adverse employment action.  See  Bylsma v. Bailey, 127 F. Supp. 2d 1211, 1231 (M.D. Ala. 2001) (the non-selection of a plaintiff employee for a training course does not constitute an adverse employment action).  See also Merriweather v. Alabama Dept. of Public Safety, 17 F. Supp. 2d 1260 (M.D. Ala. 1998), aff'd, 199 F.3d 443 (11th Cir. 1999) (same); Bullock v. Widnall, 953 F. Supp. 1461, 1473 (M.D. Ala. 1996), aff'd, 149 F.3d 1196 (11th Cir.1998).  In Bullock, the plaintiff alleged that he was denied equal access to training courses in general

---

[15] Plaintiff received training on the light span in April 2002.

and that in retaliation for the plaintiff's EEO complaints, one of the plaintiff's subordinates was selected to attend a certain course which provided training in management supervision skills. Bullock, 953 F. Supp. at 1466.  The court found that the plaintiff had failed to show that his non-selection for the training course was an adverse employment action because the plaintiff did not demonstrate that his non-selection "would affect his salary, chances of promotion, ability to perform his job, etc." Id. at 1473. The court also concluded that Plaintiff could not establish an adverse employment action simply by establishing that he or she may have benefited from the training.  Id. Plaintiff Soper has not provided sufficient evidence to establish that the alleged denial of training opportunities caused some serious and material change in the terms, conditions, or privileges of her employment.  For instance in this case, Plaintiff Soper has not shown that the training would impact her employment by affecting her salary, chances of promotion, or her ability to perform her job, etc.  The Court can not conclude that the Defendant's decision to send Plaintiff Soper to one training session over another is an adverse employment action.

The Court finds that Plaintiff Soper can not establish a prima facie case of retaliation.  Accordingly, the Defendant's motion for summary judgment as to Plaintiff Soper's retaliation claim should be granted.

## V. Conclusion

For the reasons set forth above, the Court grants in part and denies in part the Defendant's motion for summary judgment as to Plaintiff's discrimination and retaliation claims.

**DONE** and **ORDERED** this 29th day of June, 2005.


_____

**VIRGINIA EMERSON HOPKINS**
**United States District Judge**